THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DONALD RASMUSSEN, Defendant-Appellant.

Second District   No. 2—91—0117

Opinion filed August 26, 1992.

354

G. Joseph Weller and Sherry R. Silvern, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford, and Joan M. Kripke, of Chicago (William L. Browers and John X. Breslin, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

Defendant, Donald Rasmussen, was convicted after a jury trial in September 1990 of the offenses of (1) criminal fortification of a residence (Ill. Rev. Stat. 1989, ch. 38, par. 19—5); (2) unlawful use of a weapon by a felon (Ill. Rev. Stat. 1989, ch. 38, par. 24—1.1); (3) possession of a firearm without an owner's identification card (Ill. Rev. Stat. 1989, ch. 38, par. 83—2); (4) possession of cocaine (Ill. Rev. Stat. 1989, ch. 56½, par. 1402(b)); (5) possession of cannabis (Ill. Rev. Stat. 1989, ch. 56½, par. 704(b)); and (6) possession of a hypodermic needle

or syringe (Ill. Rev. Stat. 1989, ch. 38, par. 22—50). He was sentenced in January 1991 to concurrent terms of (1) five years' imprisonment for criminal fortification of a residence; (2) three years' imprisonment for unlawful use of a weapon by a felon; (3) two years' imprisonment for possession of cocaine; (4) six months in jail for possession of cannabis; and (5) 60 days in jail for possession of a hypodermic needle.

Five issues are raised on appeal, four of which deal with the criminal fortification of a residence charge: (1) whether the criminal fortification of a residence statute (Ill. Rev. Stat. 1989, ch. 38, par. 19—5) is unconstitutionally vague; (2) whether that statute violates due process as an unreasonable exercise of the State's police power; (3) whether the indictment as to defendant's violation of that statute was fatally defective; (4) whether the State proved the elements of the offense of criminal fortification of a residence beyond a reasonable doubt; and (5) whether the State proved the elements of unlawful possession of a weapon by a felon beyond a reasonable doubt. We affirm.

## FACTS

Ten witnesses testified at the three-day trial in September 1990. Detective Bruce Olson of the Rockford police department testified that he and eight other officers went to 816 Fitch Road in Rockford at 12:30 p.m. on April 26, 1990, to execute a search warrant. Olson stated that all the officers were dressed in navy blue rain jackets, with the word "police" stenciled across the back in large letters, police patches on the top of both sleeves, and a badge on the upper right torso. Olson described the building at that address as a two-story building with a garage on the first floor and an apartment above the garage. There was an interior stairway that led to the apartment. The officers ran up the stairway yelling "police; search warrant." After 15 to 20 seconds, the officers at the top of the stairs began beating at the door with a 55-pound, concrete-filled battering ram.

Olson and Detective Russell Nelson, also with the Rockford police department, were on the stairs trying to look into the apartment through a window. The window had a covering on the inside and the officers could not see in. When the officers heard running inside, Nelson smashed the window with his baton, tearing down the curtain in the process. Through the window, Olson saw a shirtless man standing seven feet from him and holding a pistol. Nelson testified that the man had the pistol pointed down and away from the officers. Olson leaned into the window with his shotgun and yelled to the man, whom Olson identified to be defendant, to drop the gun.

According to Olson and Nelson, defendant threw the pistol toward a couch in the apartment and out of view of the officers. Defendant then dove in that same direction. Ten to fifteen seconds later, defendant raised his empty hands and held that position for another 5 to 10 seconds. Olson testified that once the door gave way, Officer Marlin Peterson rushed in and began struggling with defendant. Olson entered the apartment, ran to where he thought the pistol was and unloaded the weapon. He found another magazine of bullets in a nearby hole in the wall. Olson then replaced the weapon and magazine in the position he found them near the hole in the wall by the floorboards. Deputy Arthur Blewett of the Winnebago County sheriff's department identified a photograph that he took of the weapon and magazine in that position.

Detective Olson testified that he saw another man in the apartment when he entered through the door. The man was lying on the floor, stomach side down. Nelson stated that he did not see the other man until he came into the apartment. The other man was handcuffed and later released before the officers brought defendant to the police station.

Officer Blewett testified that he was standing on the staircase landing while Detective Steve Olson of the Rockford police department started hitting the door with the battering ram. Blewett stated that the whole side of the house was moving "like an accordion" as Olson hit the door 12 to 15 times. Blewett stated that he could see in a window at the top of the stairs and saw a shadow go past the window. Steve Olson stated that he became winded while hitting the door and gave the battering ram to Officer John Versetti, who hit the door another 10 times. Olson and Versetti then hit the door with their shoulders, causing the door to give way. The officers stepped over a broken 2 by 4 board as they rushed into the apartment.

Blewett opined that the reason it took so long to break through the door was because there were brackets holding the 2 by 4 board across the door frame. The brackets were bolted through the wall. Photographs were introduced into evidence showing two brackets on each side of the door for a total of four brackets, each bracket being secured by three bolts through the wall. Blewett also stated that the door was secured with a dead-bolt lock, which he identified in one of the photographs.

Officer Blewett stated that several officers had to subdue defendant, who was thrashing, kicking and screaming. Defendant was handcuffed and his legs were secured with plastic flexicuffs. Blewett

stated that defendant continued to kick his legs so the officers fastened his handcuffs to his leg flexicuffs.

Officer Blewett testified as to several items he found or photographed in defendant's apartment, including the gun and ammunition, a triple beam scale, a small wood box containing a bag filled with a green leafy substance, a plastic bag with white powder, several pieces of magazine pages which were folded up and contained a white powder, and various syringes. Blewett also stated that he found a pill bottle and a plate which had a white powdery residue on it in the kitchen sink. Blewett identified a color photograph showing the plate in the sink, which was full of water that appeared white.

Edward McGill, a forensic scientist with the Illinois State Police, testified that the white powder in the plastic bag weighed 1.4 grams and tested positive for cocaine. The green leafy substance in the wood box weighed 3.1 grams and tested positive for cannabis.

Detective Joseph Vincere of the Rockford police department testified that he was present when the police executed the search warrant on defendant's apartment. After the other officers broke into the apartment, he tried to read the search warrant to defendant as he was thrashing about. Vincere saw defendant again at the police station, where defendant was handcuffed to a bench. As Vincere walked past defendant, defendant asked why the officers were after him and what the charges were. Vincere told him the charges. Defendant told Vincere that he did not own the gun. Defendant also denied selling drugs and told Vincere that the drugs he had were for personal use only.

At the close of the State's case, defendant made a motion for a directed verdict and to dismiss the criminal fortification of a residence charge because the statute was unconstitutionally vague. The court denied defendant's motions.

For the defense, Rick Winkler testified that he knew defendant since February 1990 and was at defendant's apartment on April 26 prior to the police arriving. Winkler stated that he and defendant were talking and getting high on cocaine earlier that day. When the police arrived, the officers shouted from the staircase and pounded on the apartment door. When the shotgun barrel came through the window, Winkler fell to the floor and stayed there the entire period that the police were in defendant's apartment. Winkler testified that defendant did not have a gun in his hands and that Winkler did not know who the recovered pistol belonged to.

Winkler stated that when the police officers rushed in, they began "pounding" on defendant and continued hitting defendant after he

was subdued. As to the 2 by 4 board across the apartment door, Winkler stated that defendant placed the board across the door as a "lock" since there was no latch on the door. Winkler stated that the 2 by 4 board kept the door closed and prevented the door from swinging open.

Michael Clark testified that the recovered pistol belonged to him. Clark had lived with defendant during April 1990 and was living there on April 26. Clark stated that he had purchased the pistol earlier that day or the day before and, without defendant's knowledge, had hidden the pistol in the hole in the wall near the floorboards. Clark testified that defendant kept a padlock on the door to the garage. According to Clark, when defendant was home, the garage door padlock was unlocked, and there was no lock on the second-floor apartment door.

Defendant testified in his own defense. Defendant admitted that he and Winkler had been using cocaine on April 26. He stated that they had used about a half of a gram and that he was still feeling some of the effects of the drug when the police arrived. Defendant admitted that a pellet gun was in plain view on a table when the police arrived.

Defendant's testimony regarding the padlock on the first-floor garage door and the 2 by 4 board across the second-floor apartment door paralleled that of Winkler and Clark. Defendant stated that the only way he could lock his apartment door when he was home was by using the 2 by 4 board. He denied that the purpose of the 2 by 4 board was to keep police officers out of his apartment.

Defendant described a square opening in the upper portion of his apartment door. The opening used to have a plexiglass insert, but defendant covered the opening with a used metal street sign for security reasons. As was evident from the photograph taken by the police after they entered the apartment, the metal piece became dislodged from the door leaving the opening exposed.

According to defendant, when the officers came to the door, he ran to the kitchen and dumped some cocaine from the pill bottle into the kitchen sink and then ran back to the front room of the apartment. Defendant stated that he did not know of Clark's gun until 15 or 20 minutes after the police arrived when one of the officers said "armed violence," "we got armed violence because they found a gun." Defendant thought that the only gun in the apartment was a pellet gun on a table in the living room. He had seen Clark and the gun that Clark had bought the night before, but did not know that Clark had hidden the gun in the apartment.

Defendant stated that when Officer Peterson came through the apartment door, Peterson grabbed defendant by the hair and threw him onto the bed. Defendant testified that officers hit him in the head and back, and one officer hit him in the face after he had been secured with handcuffs and flexicuffs. Various photographs of defendant's black eye and body wounds were introduced into evidence. Defendant admitted that the bag of cannabis was his, but only for personal use. He also admitted that the cocaine he dumped in the sink was his, for personal use only, but did not recall any plastic bag of cocaine being in his apartment.

The parties stipulated that defendant did not have a firearm owner's identification card and that he was previously convicted of a felony in 1982. After hearing closing arguments and instructions, the jury found defendant not guilty of armed violence and possession of cocaine with the intent to deliver. The jury found defendant guilty of the remaining charges.

Defendant filed a motion in arrest of judgment, again arguing that the criminal fortification of a residence statute was vague and unconstitutional. He also argued that he was not proved guilty beyond a reasonable doubt of the unlawful use of a weapon by a felon charge. The trial court denied the motion.

The trial court sentenced defendant on January 18, 1991. No sentence was imposed for defendant's failure to have a firearm owner's identification card. The court explained that the unlawful weapon sentence would cover both weapon charges. Defendant filed this timely appeal.

### IS THE CRIMINAL FORTIFICATION STATUTE UNCONSTITUTIONALLY VAGUE?

At issue in this case of first impression is whether the recently enacted criminal fortification of a residence statute (Ill. Rev. Stat. 1989, ch. 38, par. 19—5) is unconstitutionally vague. The statute reads:

> "(a) A person commits the offense of criminal fortification of a residence or building when, with the intent to prevent the lawful entry of a law enforcement officer or another, he maintains a residence or building in a fortified condition, knowing that such residence or building is used for the manufacture, storage, delivery, or trafficking of cannabis or controlled substances as defined in the Cannabis Control Act [Ill. Rev. Stat. 1989, ch. 56½, par. 701 *et seq.*] or Illinois Controlled Substances Act [Ill. Rev. Stat. 1989, ch. 56½, par. 1100 *et seq.*].

(b) 'Fortified condition' means preventing or impeding entry through the use of steel doors, wooden planking, crossbars, alarm systems, dogs, or other similar means.

(c) Sentence. Criminal fortification of a residence or building is a Class 3 felony." Ill. Rev. Stat. 1989, ch. 38, par. 19—5.

Defendant argues that the above statute violates his constitutional guarantees of due process (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2) because the following italicized phrases are vague and indefinite: "to prevent the lawful entry of a law enforcement officer *or another*" in subparagraph (a) (emphasis added) (Ill. Rev. Stat. 1989, ch. 38, par. 19—5(a)), and "steel doors, wooden planking, crossbars, alarm systems, dogs, *or other similar means*" in subparagraph (b) (emphasis added) (Ill. Rev. Stat. 1989, ch. 38, par. 19—5(b)). Defendant included various hypothetical situations within his argument in an attempt to explain the vagueness of the statute. Defendant argues that his installing a 2 by 4 board across his apartment door was an innocent act aimed at "locking" his apartment rather than thwarting attempts by the police to enter the apartment. Defendant also seeks to portray himself as a mere drug user and argues that the legislature intended the criminal fortification statute to punish "those individuals who are involved in the drug milieu at a higher level than those who possess small amounts for personal use."

The State responds that defendant has not met his burden of proving that the statute is unconstitutional since his argument is not supported by the legislative history, case law interpretation or the facts of this case. The State argues that the statute has three elements and that all three are met by the facts of this case. The State also posits that the allegedly vague areas of the statute that defendant points to do not apply in this case and are thus not at issue.

In *People v. Fabing* (1991), 143 Ill. 2d 48, our supreme court discussed due process in light of a claim that a statute was unconstitutionally vague:

"Due process requires that a statute must not be 'so vague that men of common intelligence must necessarily guess at its meaning or application. [Citations.]' (*People v. Garrison* (1980), 82 Ill. 2d 444, 453.) In addition, 'the statute must provide sufficiently definite standards for law-enforcement officers and triers of fact that its application does not depend merely on their private conceptions. [Citations.]' (*Garrison*, 82 Ill. 2d at 453.) To satisfy the requirements of due process, a statute's prohibitions must be sufficiently definite when measured by common understanding and practices. [Citation.] However, as we are

'[c]ondemned to the use of words, we can never expect mathematical certainty from our language.' *Grayned v. City of Rockford* (1972), 408 U.S. 104, 110, 33 L. Ed. 2d 222, 228-29, 92 S. Ct. 2294, 2300.

We note that all statutes are presumed to be constitutional [citation], and the party challenging the statute has the burden of clearly establishing its constitutional infirmity [citation]. In considering a vagueness challenge to a statute, absent a contrary legislative intent, a court will assume 'the words used in a statute have their ordinary and popularly understood meanings. [Citations.] In addition to the language used, consideration [will] also [be] given to the legislative objective and the evil the statute is designed to remedy. [Citation.]' *(People v. La Pointe* (1981), 88 Ill. 2d 482, 499.)" *Fabing*, 143 Ill. 2d at 53-54.

Furthermore, our supreme court has repeatedly held that "[a] defendant may be prosecuted under a statute without violating his right of due process if his conduct falls squarely within the statute's proscriptions, even though the statute may be vague as applied to other conduct." *(People v. Taylor* (1990), 138 Ill. 2d 204, 211; see *People v. Rogers* (1989), 133 Ill. 2d 1, 15.) In *Rogers*, the court concluded that defendant lacked standing to raise an unconstitutional vagueness argument since he was charged under precise terms of a statute rather than the terms he argued were vague. (*Rogers*, 133 Ill. 2d at 15.) The *Rogers* court also stated that defendant " 'may not pose hypothetical situations in which the statutory standards might conceivably be unconstitutionally vague.' " *Rogers*, 133 Ill. 2d at 15, quoting *People v. Garrison* (1980), 82 Ill. 2d 444, 456.

■ Applying those rules to the instant case, we initially question whether defendant has standing to raise a constitutional vagueness argument as to the criminal fortification statute (Ill. Rev. Stat. 1989, ch. 38, par. 19—5). Defendant was simply not charged under any of the terms or phrases that he argues are vague. As to the phrase in subsection (a) of the statute (Ill. Rev. Stat. 1989, ch. 38, par. 19—5(a)), that reads "to prevent the lawful entry of a law enforcement officer or another," defendant was charged with preventing the lawful entry of the nine police officers who executed the search warrant rather than under the phrase "or another," which he argues is vague and undefined. Similarly, as to the phrase in subsection (b) of the statute (Ill. Rev. Stat. 1989, ch. 38, par. 19—5(b)) that defines "fortified condition" as including the use of "steel doors, wooden planking, crossbars, alarm systems, dogs, or other similar means," defendant's use of a wood 2 by 4 board with four brackets to prevent access to his

362

apartment fell within the terms "wooden planking" or "crossbars" rather than the phrase "or other similar means," which he argues is vague and undefined. We therefore conclude that defendant lacks standing to challenge the alleged vagueness of the criminal fortification statute (Ill. Rev. Stat. 1989, ch. 38, par. 19—5) by way of argument or hypothetical situation. See *Taylor*, 138 Ill. 2d at 211; *Rogers*, 133 Ill. 2d at 15.

■ Furthermore, even were we to consider defendant's vagueness arguments on the merits, we do not believe that he has met his "burden of clearly establishing [the statute's] constitutional infirmity." (*Fabing*, 143 Ill. 2d at 54.) The phrase "or another" in subsection (a) of the statute (Ill. Rev. Stat. 1989, ch. 38, par. 19—5(a)) implies someone who has a legal right to be in the residence or building and is not so obscure that people of " 'common intelligence must necessarily guess at its meaning or application.' " (*Fabing*, 143 Ill. 2d at 53, quoting *Garrison*, 82 Ill. 2d at 453; see *Rogers*, 133 Ill. 2d at 15 (the court concluded that the phrase "other than a lawful purpose" was not unconstitutionally vague).) Likewise, the phrase "or other similar means" in subsection (b) of the statute (Ill. Rev. Stat. 1989, ch. 38, par. 19—5(b)) implies the use of building materials or security systems similar to those listed and is not unconstitutionally vague. (*Fabing*, 143 Ill. 2d at 53; *Rogers*, 133 Ill. 2d at 15.) We conclude that defendant has failed to establish the constitutional infirmity of the criminal fortification of a residence statute (Ill. Rev. Stat. 1989, ch. 38, par. 19—5).

### DOES THE CRIMINAL FORTIFICATION STATUTE VIOLATE DUE PROCESS?

At issue is whether the criminal fortification of a residence statute (Ill. Rev. Stat. 1989, ch. 38, par. 19—5) violates due process because it constitutes an unreasonable exercise of the State's police power.

Defendant argues that the statute is an unreasonable exercise of police power because while the statute was, according to defendant, enacted to punish "large-scale drug dealers, manufacturers and traffickers" who fortify their "drug houses, drug storage facilities and manufacturing plants," he was merely someone caught with a small amount of drugs that he kept for personal use. The State responds that the statute is a reasonable exercise of police power since it seeks to punish those in the drug world, such as defendant, who endanger law enforcement officials by actively preventing or impeding their legal entry into a building.

Under the State's police power, the legislature has the discretion to prescribe penalties for defined offenses. (*People v. P.H.* (1991), 145 Ill. 2d 209, 233; *People v. Morris* (1990), 136 Ill. 2d 157, 161.) "However, that power is tempered by constitutional limitations which prohibit deprivation of liberty without due process of law." (*P.H.*, 145 Ill. 2d at 233.) The well-accepted test in determining whether the legislature has properly exercised its power is whether the statute is reasonably designed to alleviate the evils which the legislature has determined to be a threat to the public health, safety and general welfare. (*P.H.*, 145 Ill. 2d at 233; *Morris*, 136 Ill. 2d at 162; *Heimgaertner v. Benjamin Electric Manufacturing Co.* (1955), 6 Ill. 2d 152, 159.) In construing a statute, it is instructive to consider relevant statements by legislators concerning the proposed law. *Sulser v. Country Mutual Insurance Co.* (1992), 147 Ill. 2d 548, 555.

The evils that the legislature was concerned about when it enacted the criminal fortification statute (Ill. Rev. Stat. 1989, ch. 38, par. 19–5) are illustrated by briefly reviewing some of the floor debate in the Illinois legislature over the measure:

"[Representative] Petka: *** This Amendment was drafted by the State's Attorney of Will County in connection with a series of problems that he perceived in connection with the execution of search warrants. *** The reason for this Amendment and the reason for this type of Bill is very simple. A number of years back when I was a state's attorney, we had a drug house in Joliet, unfortunately very similar to other establishments like this in the metro areas throughout the State of Illinois. And this particular drug dealer was able at various intervals to basically deter police action against a drug storehouse that he maintained there. And it became necessary on one occasion for a...an undercover agent to risk his life by literally using a tow truck to pull off the door and part of the wall collapsed simply to get into this place. We think that...and during that process all the drugs disappear, so there's no criminal offense. And that's what this Bill has been mainly aimed at and that's why I support this Amendment.
***

[Representative] Novak: *** Now I realize in certain areas in the City of Chicago and all over this state in urban areas and other areas, rural areas for that fact, that bars are put on windows for security reasons. This [measure] has no intent to deter people from doing that. What we're trying to do is simply give our law enforcement people some additional tools to go

into situations where they...where they have the legal justification to come in and make the arrest. Now, if I'm a law enforcement officer and I know that a building or an apartment is barricaded and we have...we know through the search warrant that's been approved by the judge that articles, contraband and other drug paraphernalia are there, we're going to go into that place and make the arrest. We've had...this whole Bill arose out of a situation in the City of Decatur and as Representative Petka has indicated, the City of Joliet in Will County has had problems. And we even have a problem in my home town in Kankakee, two blocks from our courthouse where our police officers are virtually afraid to go in this apartment building, it looks like Fort Apache. So we're just...what we're trying to do is give law enforcement some additional tools, reasonable tools we believe, to go in and make the arrest." 86th Ill. Gen. Assem., House Proceedings, June 16, 1989, at 78-80 (statements of Representatives Petka and Novak).

"[Representative] Novak: *** [This measure] developed out of a situation that occurred in the City of Decatur. We've also had problems with the situation with drug houses, crack houses ***. The Criminal Code does not allow for a penalty such as that. And as the Bill progressed through the Judiciary II Committee, we refined the definition of a fortified drug house with the advice and consent of the Illinois State Bar Association and that Amendment tightened up the definition ***. I think it's a good piece of Legislation. It's a phenomenon that has developed in the urban areas all over the state and also all over the country. You've read stories in Time magazine about busting the crack houses in Los Angeles and the crack *** fortified drug houses where those nefarious individuals manufacture drugs and sell...sell marijuana and other invidious drugs that are hurting our kids and destroying our society. So I think it's a necessary tool that we give to our police agencies around the state to fight these people that are doing...that are perpetrating these crimes." 86th Ill. Gen. Assem., House Proceedings, June 20, 1989, at 169 (Statements of Representative Novak).

Plainly, the legislature intended to punish those in the drug world who impede or endanger law enforcement personnel who are making a valid entry into a building. We are not persuaded by defendant's arguments that the legislature acted unreasonably when it enacted the criminal fortification statute (Ill. Rev. Stat. 1989, ch. 38, par. 19—5). The legislature defined "fortified condition" as we dis-

cussed earlier and then made it a Class 3 felony to maintain a residence or building in a fortified condition with the intent to prevent the lawful entry of a law enforcement officer or another, knowing that such a residence or building is used for the manufacture, storage, delivery, or trafficking of drugs. (Ill. Rev. Stat. 1989, ch. 38, par. 19—5.) Had the legislature intended that this statute be targeted solely at large-scale drug dealers, which defendant posits but with which we do not agree, language could have been included identifying the minimum amount of drugs in the building that would trigger this statute. We conclude that the criminal fortification statute was reasonably designed to alleviate the evils which the legislature has determined to be a threat to the public health, safety and general welfare. Defendant therefore suffered no deprivation of constitutional due process when he was convicted under the statute since the statute was a reasonable exercise of the State's police power.

WAS THE CRIMINAL FORTIFICATION INDICTMENT FATALLY DEFECTIVE?

At issue is whether the indictment of defendant for the criminal fortification of a residence offense (Ill. Rev. Stat. 1989, ch. 38, par. 19—5) was fatally defective.

Defendant contends that the indictment did not specify what particular fortification—the 2 by 4 board on the apartment door, the dead-bolt lock on the apartment door or the padlock on the garage door—triggered the criminal fortification charge and subsequent conviction. Defendant claims that as a result he could not prepare an appropriate defense and the conviction will not bar a future prosecution by the State, citing section 111—3(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 111—3(a)). Section 111—3(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 111—3(a)) requires, *inter alia*, that an indictment: (1) state the name of the offense; (2) cite what statutory provision has been alleged to have been violated; and (3) list the nature and the elements of the offense that is charged. See *People v. Nelson* (1991), 210 Ill. App. 3d 977, 980.

The State responds that the language in the indictment, which tracks the language of the criminal fortification statute, clearly apprised defendant that the charge was based on the 2 by 4 board across his apartment door.

Our analysis is guided by the Illinois Supreme Court's discussion in *People v. Thingvold* (1991), 145 Ill. 2d 441, where the court distinguished the two standards of review that a court of review should apply when an indictment is challenged on appeal:

"When an indictment or information is attacked for the first time on appeal, it is sufficient that the indictment or information 'apprised the accused of the precise offense charged with sufficient specificity to prepare his defense and allow pleading a resulting conviction as a bar to future prosecution arising out of the same conduct.' [Citations.] In other words, the appellate court should consider whether the defect in the information or indictment prejudiced the defendant in preparing his defense. If, however, the information or indictment is attacked before trial, *** the information must strictly comply with the pleading requirements of [section 111—3(a) of] the Code of Criminal Procedure of 1963 [Ill. Rev. Stat. 1989, ch. 38, par. 111—3(a)]." *Thingvold*, 145 Ill. 2d at 448.

We note that defendant first objected to the indictment halfway through the trial, at the close of the State's case in chief, when he filed a motion to dismiss the criminal fortification of a residence count. Defendant failed to object to any alleged defect in the indictment *prior* to trial. For example, defendant could have filed a bill of particulars prior to trial as a means of obtaining further information concerning the criminal fortification charge against him. (*Thingvold*, 145 Ill. 2d at 464 (Miller, C.J., dissenting, joined by Bilandic, J.).) We will therefore apply the less strict standard of review, rather than determine whether the indictment strictly complied with section 111—3(a) (Ill. Rev. Stat. 1989, ch. 38, par. 111—3(a)).

The indictment, filed on May 9, 1990, reads:

"That on the 26th day of April, 1990, in the County of Winnebago and State of Illinois, DONALD E. RASMUSSEN committed the offense of CRIMINAL FORTIFICATION OF A RESIDENCE, in that he, with intent to prevent the lawful entry of law enforcement officers, maintained his residence at 816 Fitch Road, Rockford, Illinois, in a fortified condition, knowing that said residence was being used for the storage or delivery of cannabis or cocaine, in violation of Paragraph 19—5, Chapter 38, Illinois Revised Statutes."

■■ It is apparent from the trial record that defense counsel treated the above indictment as charging a violation of section 19—5 (Ill. Rev. Stat. 1989, ch. 38, par. 19—5) based on defendant's use of a 2 by 4 board and brackets to secure his apartment door. Defendant and the two defense witnesses testified extensively concerning why defendant used a 2 by 4 board to secure his apartment. They all explained that, since the dead-bolt lock on the apartment door did not work, defendant used the 2 by 4 board to "lock" his apartment when

he was home. Defendant specifically denied that the 2 by 4 board was intended to keep police officers out of his apartment.

We are not persuaded by defendant's arguments that the indictment was insufficient in that it did not apprise him of which fortification—the 2 by 4 board, the dead-bolt lock or the padlock—triggered the indictment. The indictment contains the phrase "fortified condition," which is defined in subsection (b) of the statute as meaning "preventing or impeding entry through the use of steel doors, wooden planking, crossbars, alarm systems, dogs, or other similar means." (Ill. Rev. Stat. 1989, ch. 38, par. 19—5(b).) Defendant and his two witnesses testified that the padlock on the ground-level garage door was unlocked whenever defendant was home, such as when the search warrant was executed, and that the dead-bolt lock on the second-floor apartment door was broken. Therefore, the 2 by 4 board was the only viable means of "impeding entry" and easily falls within the meaning of "wooden planking" or "crossbars" in subsection (b) of the statute. We conclude that the indictment was of sufficient specificity to apprise defendant that he was being charged with criminal fortification of a residence based on the presence of the 2 by 4 board across his apartment door and to allow him the opportunity to prepare a defense.

This leaves for determination the question whether the indictment and subsequent conviction would be sufficient to plead in bar of a future prosecution. The indictment alleged the date and place of the commission of the offense. Furthermore, the record in this case shows that the criminal fortification of a residence charge of which defendant was convicted is specifically identifiable and could be pleaded in bar of subsequent prosecutions. (See *People v. Gilmore* (1976), 63 Ill. 2d 23, 30 (prior prosecution on the same facts may be proved by resort to the record).) We conclude that there was no error in the criminal fortification of a residence indictment.

### DID THE STATE PROVE DEFENDANT GUILTY BEYOND A REASONABLE DOUBT OF THE CRIMINAL FORTIFICATION OFFENSE?

At issue is whether the State proved defendant guilty beyond a reasonable doubt of criminal fortification of a residence (Ill. Rev. Stat. 1989, ch. 38, par. 19—5). Defendant argues that the 2 by 4 board across his apartment door was a "lock" rather than a fortification and that the 3.1 grams of cannabis and 1.4 grams of cocaine seized from his apartment are amounts too small to fall within the reach of the drug activity portion of the statute. The State responds that any ra-

tional trier of fact could have found the requisite elements of the criminal fortification statute beyond a reasonable doubt.

A court of review will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of defendant's guilt. (*People v. Burrows* (1992), 148 Ill. 2d 196, 224.) It is not this court's function to retry a defendant when considering a challenge to the sufficiency of the evidence. (*People v. Steidl* (1991), 142 Ill. 2d 204, 226.) " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Frieberg* (1992), 147 Ill. 2d 326, 360, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

■ The criminal fortification of a residence statute (Ill. Rev. Stat. 1989, ch. 38, par. 19—5) has three elements: (1) an intent to prevent law enforcement officers, or others with a legal right, from entering a residence or building; (2) fortification of the premises, as defined in the statute itself; and (3) knowledge that illegal drugs are being manufactured, stored, delivered or sold on the premises.

■ Our review of the record finds support for each element of the offense. We note that the jury heard defendant testify that after the police announced their presence and knocked, he ran to the kitchen sink to dispose of some cocaine. That action by itself supports a finding that defendant intended to prevent or impede police access to his apartment, since he chose not to answer the knock on the door.

As to the second element, we note that the jury heard testimony from various police officers concerning the execution of the search warrant at defendant's apartment: that after announcing their presence and knocking, two officers took turns beating on the door with a 55-pound battering ram; that they stepped over a broken 2 by 4 board when they finally gained access to the apartment; and that they found four brackets, each secured by three bolts through the wall, that kept the 2 by 4 board in place across the door. That testimony supports a finding that defendant maintained his apartment in a "fortified condition." The 2 by 4 board could be considered either "wooden planking" or a "crossbar" under the statutory definition of "fortified condition" (Ill. Rev. Stat. 1989, ch. 38, par. 19—5(b)).

Finally, we note that the jury heard testimony concerning the 3.1 grams of cannabis and 1.4 grams of cocaine seized by the police from defendant's apartment. Defendant admitted dumping another amount of cocaine into the kitchen sink when he heard the police outside his

apartment door. Such evidence satisfied the third element of the statute, that defendant knew that illegal drugs were being stored on the premises.

■ Defendant's contention on appeal that the 2 by 4 board was merely a "lock" to keep his apartment door closed since the dead-bolt lock did not work was a question of fact for the jury. We note that Officer Blewett testified that the dead-bolt lock appeared to be working. The jury chose not to believe defendant or his two witnesses, since the jury convicted defendant on the fortification charge. Such a question of fact, one in particular that is based on witness credibility determinations, is within the particular province of the jury. (*Frieberg*, 147 Ill. 2d at 360.) We find no reason to disturb the jury's finding in this regard.

■ We also are not persuaded by defendant's argument that the amounts seized from his apartment do not fall within the reach of the criminal fortification statute. The legislature could have specified the minimum amounts of drugs that would trigger the statute, but chose not to. Were this court to accept defendant's argument, we would be in the position of setting thresholds, completely arbitrary thresholds at that, for what amount of drugs would trigger the criminal fortification of a residence statute. Such a determination is not for the courts to make.

We conclude that, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the three essential elements of the crime of criminal fortification of a residence beyond a reasonable doubt.

### DID THE STATE PROVE DEFENDANT GUILTY BEYOND A REASONABLE DOUBT OF UNLAWFUL POSSESSION OF A FIREARM BY A FELON?

The final issue is whether the State proved defendant guilty beyond a reasonable doubt of the offense of unlawful possession of a firearm by a felon (Ill. Rev. Stat. 1989, ch. 38, par. 24—1.1). Defendant argues that the State failed to prove his actual or constructive possession of the pistol recovered during the execution of the search warrant, pointing to inconsistent and improbable testimony by the police officers. The State responds that any rational trier of fact could have concluded beyond a reasonable doubt that defendant, a convicted felon, knowingly possessed a weapon. We will analyze this issue using the same reasonable doubt standard of review as we used with the previous issue.

■ The unlawful use of a weapon by a felon statute provides, in pertinent part:

> "It is unlawful for a person to knowingly possess on or about his person or on his land or in his abode or fixed place of business *** any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction." (Ill. Rev. Stat. 1989, ch. 38, par. 24—1.1(a).)

Therefore, to sustain a conviction, the State must prove beyond a reasonable doubt that (1) defendant knowingly possessed a firearm or firearm ammunition, and (2) that defendant has been convicted of a felony. (*People v. Hammer* (1992), 228 Ill. App. 3d 318, 323; *People v. Rangel* (1987), 163 Ill. App. 3d 730, 739.) The parties stipulated to defendant's prior felony conviction, so all that remains at issue is whether defendant knowingly possessed a firearm.

Possession may be actual, based on direct evidence such as eyewitness testimony that defendant actually possessed the firearm. (See, *e.g., People v. Bond* (1989), 178 Ill. App. 3d 959, 966 (defendant admitted firing gun; additional proof supplied by three eyewitnesses).) Or possession may be constructive, based on circumstantial evidence. (See, *e.g., People v. Akis* (1976), 63 Ill. 2d 296, 298-99 (court affirmed unlawful use of weapons charge on grounds that police officer's testimony that defendant passed an object to his passenger, who then dropped a gun out of the car, was "convincing and competent"); *Hammer*, 228 Ill. App. 3d at 323 (gun found in defendant's marital closet).) This court stated in *Hammer*:

> "[C]onstructive possession of a firearm by a felon is established by showing that defendant had knowledge of the weapon and that he exerted immediate and exclusive control over the area where the weapon was found. [Citation.] Although defendant's mere presence near the weapon is insufficient, control over the location gives rise to the inference that defendant possessed the weapon, which inference is not undermined by the presence of others in the vicinity." *Hammer*, 228 Ill. App. 3d at 323.

We believe the record in this case supports a finding that defendant either actually possessed or constructively possessed the pistol. We agree with the State that this issue depends on whether the jury chose to believe the testimony of the various police officers or the testimony of defendant and his corroborating witnesses. As such, defendant has a high burden since issues of witness credibility are within the particular province of the jury as the trier of fact. *Frieberg*, 147 Ill. 2d at 360.

Both Detective Bruce Olson and Detective Nelson testified that, as other officers were using the battering ram on the apartment door,

they broke the glass in a stairway window and could see defendant holding a pistol. Nelson testified that defendant had the pistol pointed down and away from the officers. Olson testified that he leaned through the broken window with his shotgun and yelled for defendant to drop the gun. This testimony was contradicted by defendant's and Winkler's testimony. Defendant denied any knowledge that the gun was in his apartment, and Winkler denied that defendant was holding a gun when the police executed the search warrant.

However, both defendant and Winkler admit to getting high on cocaine shortly before the police arrived, which by itself casts doubt on their testimony. Furthermore, Winkler testified that shortly after the police announced their presence and attempted to gain access to the apartment, he quickly lay facedown on the floor. From that prone position, and because his attention was probably focused on the apartment door and window where police were loudly attempting to get in, his ability to observe and recall whether defendant was holding a gun is cast in doubt. We are not persuaded by defendant's arguments that the police officers' testimony is inconsistent or unconvincing. Any inconsistencies in their testimony were minor and not dispositive of this issue. We conclude that any rational trier of fact could have found that defendant actually possessed the pistol beyond a reasonable doubt, based on the eyewitness testimony of Olson and Nelson.

Assuming, *arguendo*, that the testimony of the police officers was insufficient to prove that defendant actually possessed the pistol, we believe that the record supports a finding that defendant constructively possessed the pistol. Disregarding Olson's and Nelson's testimony that they saw defendant with the pistol, we may still consider Olson's testimony that, just prior to their gaining access to the apartment, defendant dove towards the corner of the room where the pistol was eventually found. In that corner, Olson found a loaded automatic pistol, which he emptied, and an extra magazine of bullets near a hole in the wall by the floorboards. Clark's testimony that he owned the gun and that he hid it in defendant's apartment is suspect since Clark testified that the gun was unloaded when he hid it in the wall, in direct contradiction to Olson's testimony that the gun was loaded when he found it.

Defendant's reliance on *People v. Rangel* (1987), 163 Ill. App. 3d 730, is misplaced. In *Rangel*, the defendant was convicted of the unlawful use of a weapon by a felon after a .22 caliber pistol was recovered from his car. (*Rangel*, 163 Ill. App. 3d at 733.) The appellate court affirmed, based on its finding "that the totality of the facts reflected in the record lead to a reasonable inference that defendant

372

was in knowing possession of the weapon and was properly found guilty of the offense." (*Rangel*, 163 Ill. App. 3d at 739.) The court noted that after the bench trial the trial judge stated that defendant had failed to rebut the presumption that arose from the facts presented that he was in constructive possession of the pistol recovered from his car, in large part because one of defendant's key witnesses was not credible. *Rangel*, 163 Ill. App. 3d at 740.

We believe *Rangel* supports our finding here, that, based on the totality of the facts in the record, the State established that defendant was in constructive possession of the pistol recovered from his apartment. (See *Hammer*, 228 Ill. App. 3d at 323-24 (constructive possession of weapons found where guns were recovered from marital closet, and defendant's wife and son denied using them); *People v. Elam* (1990), 197 Ill. App. 3d 8, 12-13 (constructive possession of weapon found where pistol was recovered from defendant's girlfriend's apartment, which defendant frequented and in which he sometimes slept).) We conclude that any rational trier of fact could have found that defendant was in constructive possession of the pistol recovered from his apartment beyond a reasonable doubt.

For the above reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

McLAREN and DUNN, JJ., concur.