# Illinois Official Reports

## Appellate Court

---

### *In re Nasie M.*, 2015 IL App (1st) 151678

---

| | |
|---|---|
| Appellate Court Caption | *In re* NASIE M., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Nasie M., a Minor, Respondent-Appellant). |
| District & No. | First District, Second Division <br> Docket No. 1-15-1678 |
| Filed | December 1, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-JD-68; the Hon. William G. Gamboney, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Kristen E. Mueller, all of State Appellate Defender's Office, of Chicago, for appellant. <br><br> Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Lisa Sterba, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion. <br> Justices Neville and Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1　　The State contends Nasie M., a minor, accidently shot himself twice in the foot, for which it charged him with reckless discharge of a firearm, two counts of aggravated unlawful use of a weapon, and unlawful possession of a firearm. The State's case rests on a police officer who testified that Nasie told him he was holding a gun and shot himself while running away from two men he thought were going to rob him. Nasie, however, denies admitting he shot himself and maintains that one or both of the men shot him. The trial court found the State's theory more believable and convicted Nasie on three of the four charges. The trial court committed Nasie to the Department of Juvenile Justice (DJJ) for an indeterminate term.

¶ 2　　Nasie contends his conviction should be reversed because the State presented no evidence he possessed a firearm when he was shot in the foot. Alternatively, Nasie asserts the trial court violated his statutory and due process rights by sentencing him without a parent present and by failing to comply with the requirements of section 5-750(1) of the Juvenile Court Act of 1987 (705 ILCS 405/5-750(1) (West 2012)) when committing him to the DJJ for an indeterminate term.

¶ 3　　We conclude that the State failed to prove beyond a reasonable doubt that Nasie possessed a firearm and, thus, could not prove he committed the offenses of reckless discharge of a firearm, aggravated unlawful use of a weapon, or unlawful possession of a firearm. Because we reverse, we need not address Nasie's sentencing arguments.

¶ 4　　　　　　　　　　　　　BACKGROUND

¶ 5　　On September 30, 2014, Nasie sustained gunshot wounds to his foot and was taken to the hospital. On January 8, 2015, the State filed a petition for adjudication of wardship alleging that Nasie, who was 17 years old, shot himself in the foot with a firearm and was delinquent based on the following offenses: one count of reckless discharge of a firearm (720 ILCS 5/24-1.5(a) (West 2012)) (count I), two counts of aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(3)(C), (a)(3)(I) (West 2012)) (counts II and III), and one count of unlawful possession of a firearm (720 ILCS 5/24-3.1(a)(1) (West 2012)) (count IV).

¶ 6　　At the adjudicatory hearing, Detective Daniel Berg testified. Detective Berg stated that on September 30, 2014, at about 8:30 p.m., he went to a vacant lot at 535 North Sawyer Avenue in Chicago, to investigate a report of a juvenile shot. When he arrived, Detective Berg learned that Nasie, the victim, was at the hospital for treatment. Detective Berg saw a crime scene marker in the vacant lot indicating a spent shell casing had been found there. Detective Berg went to Nasie's girlfriend's apartment about a block and a half away. Officers informed Detective Berg that a .38-caliber revolver had been recovered from the apartment. Detective Berg and his partner, Detective Connolly, then went to the hospital to speak with Nasie.

¶ 7　　When Detective Berg walked into Nasie's examination room, he saw Nasie had a gunshot wound on the top of his foot. He did not see the bottom of his foot. After advising Nasie of his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)), Detective Berg asked him what happened. Nasie told Detective Berg that as he was walking past a vacant lot with his girlfriend, two people approached from behind. He was scared and began to run. He heard gunshots and felt pain in his foot. Detective Berg told Nasie he could not have been shot on top of his foot if a shooter had approached him from behind. Detective Berg also told Nasie

that a gun had been found at his girlfriend's house and asked if it belonged to him. Nasie admitted the gun was his. He said he had it for protection because he had recently been robbed and beaten up on that block. Detective Berg said that Nasie told him that while he and his girlfriend were walking, he was holding the gun with the sleeve of his sweatshirt pulled down over it. He said when he heard footsteps, he thought he was going to be robbed and beaten again, so he started to run and accidentally pulled the trigger and shot himself. He and his girlfriend ran to her apartment, and she took the gun inside.

¶ 8    On cross-examination, Detective Berg said he did not examine the shell casing found in the vacant lot and did not know if it was a .9-millimeter casing. He explained that revolvers generally do not eject shell casings but pistols do. He stated that when he saw the injury to the top of Nasie's foot he had reason to believe Nasie shot himself. He did not know if Nasie was on pain medication when he questioned him in the emergency room, and he acknowledged he did not inventory Nasie's sweatshirt or shoes or send those items out for gunshot residue testing.

¶ 9    Officer Tricia Solis went to the location of the shooting at about 8:35 p.m., in response to a call of a woman with a gun. Solis said when she arrived she saw both Nasie and his girlfriend, Kavarcia. According to Solis, her partner spoke with Nasie and Kavarcia, while she looked for the gun and shell casings. Solis found shell casings.

¶ 10    Officer Rojas testified that at about 9 or 9:15 p.m., he went to the first floor apartment of Kavarcia's mother to investigate a report of an accidental self-inflicted gunshot. Rojas spoke to Kavarcia and her mother, the leaseholder. Kavarcia's mother consented to a search of the apartment. Rojas found a .38-caliber revolver under a mattress in the first bedroom. Officer Theodore Delis, an evidence technician, recovered the gun. Delis testified that the cartridge of the .38-caliber revolver had a live, not a spent, round.

¶ 11    Officer Patrick Bowery arrested Nasie on January 7, 2015. Nasie did not have a Firearm Owners Identification (FOID) card on him at that time.

¶ 12    After the State rested, defense counsel moved for a directed finding, which was granted as to count II (AUUW based on carrying a firearm without a valid FOID card) and denied as to counts I, III, and IV.

¶ 13    Nasie testified that on September 30, 2014, he and his girlfriend, Kavarcia, were walking in the 500 block of North Sawyer Avenue at about 8:30 p.m. They were listening to music on one set of headphones, so Nasie had a headphone in one of his ears. Nasie said he heard rustling coming from the bushes across the street. Nasie turned around and saw two black men coming out of the bushes and running toward him. Nasie recognized them from school but did not know their names. Nasie described one of the men as dark skinned and skinny and wearing a black hoodie and black jeans and holding a revolver. He said the other man was light skinned and heavy set, with a black hoodie and sky blue pants. The second man was holding an automatic pistol. Nasie said the men were about 50 feet away and when he saw that they were running in his direction, he and Kavarcia ran. Nasie then heard seven gunshots and felt a burning feeling in his right foot.

¶ 14    Nasie said he had two gunshot wounds to the bottom of his foot and one to the top of his foot. He rated his pain level as 10 on a scale of 1 to 10. At the hospital he was given pain medication, which helped ease the pain but made him feel high and tired and caused blurry vision. Nasie was in and out of sleep and did not recall speaking to anyone from the police department while in the emergency room or later, when he was moved to a different part of

the hospital. Nasie denied telling the police he was trying to get a gun out of his sleeve and accidentally shot himself in the foot. Defense counsel showed Nasie photographs of the red hoodie he was wearing the night he was shot, which did not show any bullet holes in the sleeves. Defense counsel also showed Nasie photos of his foot, taken on January 16, 2015, while he was at the Juvenile Temporary Detention Center (JTDC). The pictures showed one dark spot on the top of Nasie's foot and two lighter spots on the bottom of his foot.

¶ 15    After closing arguments, the judge found Nasie guilty of reckless discharge of a firearm, AUUW, and unlawful possession of a firearm. The judge acknowledged the police could have done more, including inventorying Nasie's clothing, checking for gunshot residue and finger prints, and forensic testing of the gun that was recovered. The judge said he was not "100 percent sold" that the gun was actually used in the shooting but that "I don't even know if you need a gun recovered in a case like this." He found the pictures of Nasie's foot unhelpful in determining how Nasie sustained his injuries, because the photos were blurry and were taken several months after the shooting. The judge also noted that neither side presented any medical testimony regarding Nasie's gunshot wounds.

¶ 16    The judge's decision turned primarily on an assessment of the credibility of the witnesses. The trial court found Detective Berg's testimony to be credible and believable and Nasie's testimony not to be credible. He said the defense did not provide medical testimony to support its argument that Nasie's statement at the hospital was unreliable because he was under the influence of pain medication. He concluded that Nasie was "alert enough to at least make up what I believe to be a lie about how he said this happened and then after being confronted with some problems with his story, he admits shooting himself."

¶ 17    Nasie's dispositional hearing began on May 28, 2015. Nasie's mother, sister, and stepfather were present. The judge reviewed Nasie's juvenile record from the social investigation report, noting that he had four prior referrals to juvenile court, with three findings of delinquency and one probation violation finding. The social investigation report indicated Nasie had been in the JTDC 12 times and was twice committed to the Department of Corrections, in October 2012 and September 2013. The State asked for a "straight commit" to the DJJ, arguing Nasie was a danger to himself and others, given that he shot himself in the foot. The State also noted Nasie had a prior adjudication in 2013 for robbery and AUUW and asked that Nasie be committed on count III, AUUW, the highest classed offense.

¶ 18    Defense counsel asked the court to consider Nasie's behavior and accomplishments since entering the JTDC five months earlier. He noted that Nasie reached the highest level of status for behavior, regularly attended school, and had no major rule violations. He also earned 11 awards and certificates for leadership, behavior, and academics. Counsel referred to Nasie's strong family support and structure, noting that a family member attended every court date, except when advised that their presence was not necessary. Defense counsel asked that Nasie be given a "finding to stand, case closed" or alternatively, a "30-day closeout while he remains in JTDC."

¶ 19    The judge continued the hearing to permit the parties to research whether the State had properly notified Nasie that his count III conviction for AUUW would be considered a Class 2 rather than a Class 4 felony based on his prior AUUW conviction. When the hearing resumed on June 11, 2015, the judge noted that Nasie's sisters and niece were in court, but that his mother was absent. The judge ruled that the State's notice regarding the decision to

proceed on the AUUW as a Class 2 felony only applied to count II and not count III. Then, after arguments in aggravation and mitigation and Nasie's brief statement in allocution, the judge announced his findings. The judge imposed a straight commitment order on count III (AUUW) as a Class 4 felony and on count I (reckless discharge) as a Class 4 felony. He vacated count IV because it merged with count III and gave Nasie 156 days of credit for presentence incarceration.

¶ 20                                    ANALYSIS

¶ 21    Nasie argues the State failed to prove beyond a reasonable doubt that he committed the offenses of reckless discharge of a firearm, AUUW, or unlawful possession of a firearm, because the State presented no evidence that he actually possessed a firearm. The State contends both direct and circumstantial evidence supported Nasie's convictions. Specifically, Detective Berg's testimony that Nasie told him he accidentally shot himself with a gun and the location and nature of Nasie's wounds led to the reasonable inference the injuries were self-inflicted.

¶ 22    Juvenile delinquency proceedings have three phases: the findings phase, the adjudicatory phase, and the dispositional phase. *In re Samantha V.*, 234 Ill. 2d 359, 365 (2009). During the findings phase, the court holds a trial applying the rules of evidence for a criminal case, and the State presents proof beyond a reasonable doubt of every necessary fact to find a respondent delinquent. *Id.* If a delinquency finding is entered, the matter proceeds to sentencing. 705 ILCS 405/5-620 (West 2012); *Samantha V.*, 234 Ill. 2d at 365. The sentencing proceeding includes the adjudication phase, where the court determines whether it is in the best interests of the minor and the public to make the minor a ward of the court. 705 ILCS 405/5-705(1) (West 2012); *Samantha V.*, 234 Ill. 2d at 365. If the court makes the minor a ward of the court, the matter proceeds to the dispositional phase where the court fashions an appropriate sentence that will best serve the minor and the public. *Samantha V.*, 234 Ill. 2d at 365-66.

¶ 23    When a respondent challenges the sufficiency of the evidence, the relevant question on review involves whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found proof of the essential elements of the crime beyond a reasonable doubt. *In re W.C.*, 167 Ill. 2d 307, 336 (1995). Generally, the trier of fact sits in the best position to assess credibility; it is not the function of a reviewing court to retry the respondent. *People v. Austin M.*, 2012 IL 111194, ¶ 107. A delinquency finding will only be reversed when the proof was so improbable, implausible, or unsatisfactory that reasonable doubt exists as to the respondent's guilt. *In re Keith C.*, 378 Ill. App. 3d 252, 257 (2007).

¶ 24    Circumstantial evidence that proves the elements of the crime charged beyond a reasonable doubt suffices to sustain a criminal conviction. *People v. Hall*, 194 Ill. 2d 305, 330 (2000). "Circumstantial evidence is 'proof of facts and circumstances from which the trier of fact may infer other connected facts which reasonably and usually follow according to common experience.' " *People v. McPeak*, 399 Ill. App. 3d 799, 801 (2010) (quoting *People v. Stokes*, 95 Ill. App. 3d 62, 68 (1981)). In determining the reasonableness of an inference, the trier of fact need not look for all possible explanations consistent with innocence or "be satisfied beyond a reasonable doubt as to each link in the chain of circumstances." (Internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 117

(2007). Instead, all the evidence as a whole must satisfy the trier of fact that the defendant is guilty beyond a reasonable doubt. *People v. Edwards*, 218 Ill. App. 3d 184, 196 (1991).

¶ 25    The offenses of reckless discharge of a firearm and unlawful possession of a firearm require proof that a defendant actually possessed a firearm. The reckless discharge statute provides: "A person commits reckless discharge of a firearm by discharging a firearm in a reckless manner which endangers the bodily safety of an individual." 720 ILCS 5/24-1.5(a) (West 2012). The unlawful possession statute provides: "A person commits the offense of unlawful possession of firearms or firearm ammunition when *** [h]e [or she] is under 18 years of age and has in his possession any firearm of a size which may be concealed upon the person." 720 ILCS 5/24-3.1(a) (West 2012). In addition, the AUUW count, as charged, also requires proof that Nasie possessed a firearm. Under section 24-1.6(a)(3)(I), a person under the age of 21 commits the offense of AUUW when he or she knowingly possesses a pistol, revolver, stun gun, or taser or other firearm unless the person is engaged in lawful activities under the Wildlife Code (520 ILCS 5/1.1 *et seq.* (West 2012)). 720 ILCS 5/24-1.6(a)(3)(I) (West 2012).

¶ 26    Thus, the State had to provide evidence showing beyond a reasonable doubt that Nasie was in possession of a firearm. The crux of the State's case consists of Detective Berg's testimony that at the hospital, although Nasie initially claimed he was shot at while running away, he changed his story and admitted to accidentally shooting himself when Detective Berg suggested the shooting could not have occurred the way Nasie claimed. Nasie refuted this version of events, stating that he was shot in the bottom of his foot while being chased by two men. He also asserted that he never told Detective Berg he accidentally shot himself. The defense suggested that if Nasie had told Detective Berg he shot himself that admission was not reliable because he was under the influence of pain medication.

¶ 27    The State presented no eyewitness testimony that Nasie possessed a gun when shot. The State did not present any forensic evidence connecting Nasie to the shell casing recovered in the vacant lot or the shell casing to the gun the police recovered from Nasie's girlfriend's apartment. Indeed, Detective Berg acknowledged that a revolver, like the one the police recovered at the girlfriend's apartment, would not have expelled a shell casing, thus severing any connection between the shell casing found in the parking lot and the gun found at the apartment. Furthermore, the lack of forensic evidence fails to establish that the gun recovered even had been fired that day. Officer Delis testified the recovered revolver had a live .38-caliber round and did not contain any spent cartridges. Moreover, the State failed to perform any forensic testing on Nasie's clothes, shoes, or hands to check for gunshot residue. Thus, no physical evidence shows that Nasie had fired a gun.

¶ 28    Aside from Detective Berg's testimony, Nasie's foot wounds provided the only other evidence that he was shot. Although the State contends Detective Berg's testimony about his conversation with Nasie at the hospital supports a finding that Nasie admitted to shooting himself, Nasie denies ever having that conversation with Detective Berg. Some dispute exists as to whether Nasie was shot in the top of the foot, as the State contends, or on the bottom of the foot, as Nasie contends. Medical records and evidence may have helped clarify this question, but the record does not contain those records or explanatory evidence. Moreover, one of the State's witnesses, Officer Solis, testified that her partner spoke with Nasie at the scene of the shooting, but the State failed to present Solis's partner as a witness or any evidence as to what Nasie said at that time. Certainly, Solis's partner's testimony about what

he saw and what Nasie said immediately after the shooting could shed light on what actually occurred.

¶ 29    To support its argument that the evidence presented established Nasie's guilt, the State relies on three cases involving a defendant convicted for possession of a weapon by a felon: *People v. Griham*, 399 Ill. App. 3d 1169 (2010), *People v. Peete*, 318 Ill. App. 3d 961 (2001), and *People v. Rasmussen*, 233 Ill. App. 3d 352 (1992). But each of these cases, unlike here, entailed more direct evidence of the defendant's guilt, namely eyewitness testimony that the defendant had a firearm or recovery by the police of the firearm. In *Griham*, the police arrested the defendant in response to a 911 call reporting a man with a gun in his car. *Griham*, 399 Ill. App. 3d at 1170. The State presented the recorded statements that two eyewitnesses gave to the police on the day of the arrest, stating that they saw defendant with a gun. *Id.* One eyewitness said the defendant pointed a handgun at him and said that if his brother or cousin testified in court against defendant's friends regarding an earlier robbery, there " 'was gonna be some bloodsheddin'.' " *Id.* The other eyewitness's recorded statement recounted seeing defendant pull a handgun on the other eyewitness. *Id.* At trial, the eyewitnesses who had been threatened recanted and the other eyewitness testified that the gun was just a toy gun. *Id.* The defendant was found guilty of unlawful possession of a weapon by a felon and, the appellate court affirmed, concluding that "the jury in this case could have found the prior inconsistent recorded statements of [the witnesses] were more believable than their testimony at trial." *Id.* at 1171.

¶ 30    In *Rasmussen*, the State presented eyewitness testimony from two police officers who saw the defendant holding a gun in his hand before throwing it out of sight. *Rasmussen*, 233 Ill. App. 3d at 356. The police immediately recovered the gun where defendant had thrown it. The defense presented an eyewitness who testified that the defendant was not holding a gun and that the gun's owner was unknown and another witness who claimed the gun was his and that he had hidden it in the defendant's apartment without his knowledge. *Id.* at 357-58. The appellate court affirmed defendant's conviction stating that "this issue depends on whether the jury chose to believe the testimony of the various police officers or the testimony of defendant and his corroborating witnesses. As such, defendant has a high burden [because] issues of witness credibility are within the particular province of the jury as the trier of fact." *Id.* at 370.

¶ 31    In *Peete*, a police officer testified that while chasing the defendant he saw him reaching for something at his hip. 318 Ill. App. 3d at 963. The police lost sight of the defendant as he turned the corner at a house. After apprehending and arresting the defendant, the police found a gun near the house on the corner, where the police had lost sight of the defendant. *Id.* The owner of the residence testified that his children played on the porch earlier in the day and had not seen the gun. *Id.* at 965-66. The appellate court affirmed defendant's conviction, finding that "[b]ased on the circumstantial evidence, a rational trier of fact could have found defendant guilty beyond a reasonable doubt." *Id.* at 966. The court stated that "[w]hile the testimony is sketchy and confusing, a reasonable jury could have concluded that defendant" discarded the gun while he "was out of the sight of both [police officers]." *Id.* at 965.

¶ 32    The State asserts that as in *Griham*, *Peete*, and *Rasmussen*, we should affirm the trial court's finding that the police witnesses were more credible than Nasie and sufficient to support a finding of guilt beyond a reasonable doubt. We disagree. Unlike in *Griham* and *Rasmussen* no eyewitnesses saw Nasie holding a gun or, as in *Peete*, anything that could

reasonably be believed to be a gun. Further, although police recovered a gun in Nasie's girlfriend's apartment, that gun turned out to be inconsistent with the shell casing found in the vacant lot, nor was there evidence that the revolver had been fired, as it contained only one unspent cartridge. No forensic testing had been conducted on the revolver, the shell casing, Nasie, or the clothes he wore to establish that the revolver had been recently fired by him.

¶ 33    Moreover, no evidence established the nature of Nasie's wound to his foot. Detective Berg testified that after seeing the injury to the top of Nasie's foot he surmised the wounds were self-inflicted. The State presented no medical or expert evidence showing that Nasie was shot in the top of the foot, which would lend support to the State's theory that the gunshot wound was self-inflicted.

¶ 34    The State argued in its brief and at oral argument that when a case boils down to a credibility determination and a resolution of conflicting testimony, a reviewing court may not substitute its judgment for that of the trier of fact. *People v. Jones*, 295 Ill. App. 3d 444, 452 (1998). The State asserts that because the trial judge heard one version of events from Detective Berg and another version from Nasie and found the former to be credible and the latter to be not credible, we must defer to the trial court's judgment. We agree that a reviewing court in "carefully examin[ing] the evidence" must give "due consideration to the fact that the court and jury saw and heard the witnesses." *People v. Smith*, 185 Ill. 2d 532, 541 (1999). We also acknowledge that the testimony of a single witness can be sufficient to convict. *Id.* But, as our supreme court stated in *Smith*, despite our deference to the trier of fact on witness credibility, we may reverse a conviction "where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *Id.* at 542. We find the evidence, or lack of evidence, so unsatisfactory that it creates a reasonable doubt as to Nasie's guilt.

¶ 35    First, the State offered no eyewitnesses to the shooting or any evidence that Nasie was in possession of the gun when he injured his foot. In addition, the State presented testimony that there was a bullet casing found near where the shooting occurred but no evidence tying it to Nasie's wounds. Indeed, at oral argument, the State agreed the casing could have been from a prior shooting, which begs the question as to why the State presented testimony about it. The State also offered testimony about the discovery of the revolver at Nasie's girlfriend's apartment. But again, there is no evidence showing that the revolver was fired that night or was in any way connected to this shooting. Further, as to the issue of witness credibility, the State argues that we should presume Nasie was credible when he purportedly confessed to Detective Berg at the hospital but not credible when he testified at trial, without explaining why. Moreover, the State's version of events is not necessarily corroborated by the testimony at trial. Detective Berg testified that he responded to a report of a shooting at approximately 8:30 p.m. He further testified that at the hospital, Nasie told him that after he shot himself in the foot, he and Kavarcia ran to her apartment and stashed the gun. But, Officer Solis testified that when she went to the vacant lot at about 8:35 p.m., both Nasie and Kavarcia were there. She also testified that her partner spoke with Nasie, but the State never presented the partner as a witness. Thus, according to the testimony presented by the State, after getting shot in the foot, which the State concedes was a painful injury, Nasie ran or hopped to Kavarcia's apartment to get rid of the gun and then returned to the vacant lot to speak to the police, all within the span of a few minutes, which appears questionable.

¶ 36    So, we are left with the wounds to Nasie's foot, which the State asserts came about from a self-inflicted gunshot. The State notes that Nasie stated on numerous occasions during his testimony that he still had bullet fragments in his foot, but Nasie, a teenager, hardly qualifies as a medical expert. The State also pointed to Detective Berg's testimony that he saw the wound on the top of Nasie's foot and determined it was a gunshot wound. But again, as the State concedes, Detective Berg is not an expert on gunshot wounds. In the absence of medical or gunshot expert testimony, it is not possible to conclude, beyond a reasonable doubt, that Nasie's wounds came from a firearm and were self-inflicted.

¶ 37    Lastly, absent here is evidence of eyewitnesses seeing a defendant holding a gun, as in *Rasmussen*, or forensic evidence showing that the defendant fired a gun, or medical evidence establishing the gunshot wounds were self-inflicted. None of that is the case here. Moreover, inconsistencies in the testimony of the State's witnesses cast doubt as to what occurred on the night of the shooting. Without evidence showing that Nasie possessed a firearm or circumstantial evidence showing his wounds must have been self-inflicted, the charges against Nasie, which required evidence of possession of a firearm beyond a reasonable doubt, cannot stand. Thus, we reverse his conviction.

¶ 38                                        CONCLUSION
¶ 39    The State has failed to prove beyond a reasonable doubt that Nasie possessed a firearm when he was shot in the foot and, thus, his convictions for reckless discharge of a firearm, AUUW, and unlawful possession of a firearm must be reversed. Accordingly, we do not reach Nasie's sentencing arguments.

¶ 40    Reversed.