2026 IL App (1st) 240009-U

No. 1-24-0009

First Division
June 8, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22 CR 10488 |
| GREGORY SHERMAN, | ) ) | Honorable Mary Margaret Brosnahan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Justice Howse concurred in the judgment.
Presiding Justice Fitzgerald Smith specially concurred.

**ORDER**

¶ 1    *Held*:    The trial court's judgment is affirmed where: (1) there was sufficient evidence to find defendant guilty of being an armed habitual criminal, (2) there was no error in the admission of certain testimony at trial, (3) defendant's arrest pursuant to an investigative alert was constitutional, and (4) the armed habitual criminal statute is not facially unconstitutional.

¶ 2     Following a jury trial, defendant-appellant was found guilty of being an armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2020)) and sentenced to 10 years' imprisonment.[1] On direct appeal, defendant argues that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) he was denied his right to a fair trial where the State elicited improper hearsay testimony; (3) the State violated his constitutional rights by arresting him pursuant to an investigative alert; and (4) the AHC statute is facially unconstitutional. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4     On August 24, 2022, defendant was arrested, and on September 20 2022, he was indicted for the offenses of AHC, unlawful use of a weapon by a felon, and two counts of aggravated unlawful use of a weapon. The charges stemmed from an incident that occurred on July 9, 2022, at the Shell gas station located at 1768 West Armitage Avenue.

¶ 5     Defendant was initially represented by private counsel, Patrick Campanelli and Ari Williams. Defendant's first jury trial began on June 27, 2023. The jury could not reach a unanimous verdict, and, therefore, the trial ended in a mistrial.

¶ 6     On June 29, 2023, defendant informed the court that he wished to demand trial. His private counsel stated that they were both unavailable under the circumstances of a trial demand. They withdrew their representation, and defendant filed a motion to represent himself. The court admonished defendant regarding his right to an attorney, the difficulties with representing himself, the advantages of counsel representation, and the charges against him and their accompanying penalties. Defendant confirmed with the court that he wanted to demand trial and to represent

---

[1] Effective January 1, 2025, this offense has been renamed "[u]nlawful possession of a firearm by a repeat felony offender." See Pub. Act 103-822, § 20 (eff. Jan. 1, 2025) (amending 720 ILCS 5/24-1.7).

himself, and he confirmed that he understood the sentencing range for the offense charged. The court then allowed defendant to proceed *pro se*.

¶ 7    Prior to trial, defendant filed several motions, including a motion to suppress his arrest. The State responded that there was probable cause to support his arrest, and the court denied the motion.

¶ 8    The case again proceeded to a jury trial on July 24, 2023, at which defendant continued to represent himself.

¶ 9    Chicago police officer Resendiz[2] testified that, on July 9, 2022, he and his partner, Chicago police officer Ben Clifford, were patrolling the bar district area on Milwaukee Avenue from Division Street to North Avenue. At 11:46 p.m., there was a dispatch of a person who arrived at St. Elizabeth's Hospital with a gunshot wound. Upon arrival at the hospital, Officer Resendiz spoke with defendant, who informed him that he was shot exiting District, a bar located at 1540 North Milwaukee Avenue. He further informed Officer Resendiz that he was leaving the bar when an altercation occurred between two unknown individuals and he was shot, although he was not the target. After this conversation, Officer Resendiz radioed the information to other police units in the area so they could further investigate. Defendant also informed Officer Resendiz that he drove himself to the hospital and his silver Lexus was parked in front of the hospital. Officer Resendiz confirmed that the car was registered in defendant's name and then looked through the windows into the car and observed blood on the driver's seat. His body-cam footage was then admitted into evidence and played for the jury.

---

[2]Officer Resendiz's first name does not appear in the record.

¶ 10   On cross-examination, Officer Resendiz confirmed that he did not receive a dispatch regarding a person shot at 1514 Milwaukee Avenue, he did not enter defendant's car, and there was no gun recovered in or near his car. On redirect, Officer Resendiz testified that St. Elizabeth's is about a mile and a half from the Shell gas station at 1768 West Armitage Avenue.

¶ 11   Chicago police officer Jeffery Gipson testified that, on July 9, 2022, he was patrolling the same bar district area as Officer Resendiz, both in his vehicle and on foot. Officer Gipson recalled that, around 11:46 p.m., there was a dispatch of a person shot, and, after other officers responded to that dispatch to determine where the shooting occurred, the address of 1514 North Milwaukee Avenue was provided in relation to the shooting. Officer Gipson and his partner went to that location, which was Nick's Beer Garden, and "spoke with community members as well as the bar staff, in particular doormen and bouncers." They also went to District at 1540 North Milwaukee Avenue and Debonair at 1569 North Milwaukee Avenue and spoke with individuals at those locations as well. When asked if he learned of any altercations in the area, Officer Gipson answered: "Everyone corroborating said that it was pretty peaceful, nothing seemed out of the norm." He further testified that no one informed him of any shootings, he did not hear any gunshots that evening, and he did not see anything to suggest that there had been a shooting, such as groups of people disbursing and running from the area.

¶ 12   On cross-examination, Officer Gipson testified that District permanently closed in December 2022 because of gun violence. He also clarified that there were two dispatch calls that night, "one from the hospital and another one was at a gas station."

¶ 13    Chicago police officer Cauinian[3] testified that, on July 9, 2022, he was on routine patrol duty with his partner, Chicago police officer Miguel Cordero. Around 11:46 p.m., they were dispatched to respond to a call of a person shot at the Shell gas station at 1768 West Armitage Avenue. Officer Cauinian spoke with Juan Hernandez, a gas station employee, who showed them a "fired bullet" on the floor inside the gas station. Officer Cauinian testified that there was no blood on the bullet when it was recovered.

¶ 14    On cross-examination, Officer Cauinian testified that they did not activate their lights or sirens on the way to the gas station and they did not secure the crime scene because it was only an investigation. Officer Cauinian's body-worn camera footage was entered into evidence and played for the jury. Officer Cauinian confirmed that he did not see any blood inside or outside of the gas station, but Hernandez had informed him that he cleaned the floor before the officers arrived. Officer Cauinian also confirmed that he did not know where the bullet came from or if anyone had touched it before it was recovered. On redirect examination, Officer Cauinian confirmed that, when he arrived at the gas station, there was no one present who had been shot.

¶ 15    Asad Munawar testified that he worked for Gas Depot, a company owning multiple gas stations, and was the district manager of the Shell gas station. Munawar testified that the gas station was equipped with functioning surveillance cameras inside and outside of the store. On July 10, 2022, after learning of an incident occurring at the gas station the day prior, Munawar obtained the relevant video recordings from the surveillance cameras and provided them to law enforcement. Three videos, two showing the inside of the gas station and one showing the outside, were played for the jury.

---

[3]Officer Cauinian's first name does not appear in the record.

¶ 16    Our review of the videos showed the following. The first video clip, with a view of the interior of the gas station with a timestamp of 11:19 p.m., showed defendant entering the gas station and standing in line at the counter behind a man in a blue shirt. Defendant appears to have a cell phone in his right hand, and his left hand is in or near his back left pants pocket. A few seconds after entering the gas station, as defendant appears to be, for lack of a better word, fiddling with something in his back pocket, there is a small flash near his legs, and he slightly hops or steps to the right as he looks down at his right foot. At the same time as the flash, the customer in the blue shirt appears startled and immediately looks behind him at defendant. The customer backs away from defendant as defendant immediately exits the gas station. The customer looks at the floor where defendant was just standing and then walks towards the exit door, appearing to see where defendant went. Hernandez, dressed in a red shirt, then enters the frame. The customer appears to speak to Hernandez and points to the floor where defendant had been standing. The second video clip shows the same sequence of events but from a different angle inside the gas station.

¶ 17    The third video clip shows the exterior of the gas station, facing the gas pumps. This video is timestamped at 11:18 p.m. and shows defendant standing near a silver sports utility vehicle, which is parked at one of the gas pumps. Defendant appears to remove the gas cap from his car and attempts to pay but then sets the gas cap down near the gas pump and walks into the gas station. Defendant has a normal gait upon entering the gas station. Defendant reenters the frame about 20 seconds later. His gait is different from before, and he is walking quickly, almost running. Defendant speaks to the man at the gas pump next to him and, again, appears to look down at his foot. He then limps about three steps over to his car and enters the driver's seat. The other man

quickly walks over to replace defendant's gas cap before defendant reverses out of the parking lot quickly.

¶ 18 On cross-examination, Munawar testified that he did not recall seeing any footage of Hernandez sweeping or mopping the gas station, but he did not watch all of the footage from that day.

¶ 19 Chicago police officer JD Howard testified that, on August 24, 2022, he and his partner, Chicago police officer Engram,[4] were assigned to the fugitive apprehension unit, which is tasked with locating and arresting "individuals who either have active warrants or probable cause to arrest exists based upon detectives['] investigations." They received a case involving the reckless discharge of a firearm and conducted an investigation to identify the target of that offense. They proceeded to an apartment building at 4600 North Albany Avenue and observed defendant exit the building and enter an Uber. Defendant matched the description they had received of the offender. Officer Howard observed that defendant was using crutches. After following the Uber for a short period of time, they conducted a stop on the car and Officers Howard and Engram arrested defendant. Officer Howard's body-worn camera footage, which was played for the jury, showed defendant with crutches. On cross-examination, Officer Howard testified that he authored the arrest report, and he confirmed that the report states that the original incident occurred at 1514 North Milwaukee Avenue. Officer Howard admitted that the address in the report was an error because the incident actually occurred at the Shell gas station near Armitage Avenue and Wood Street.

---

[4]Officer Engram's first name does not appear in the record.

¶ 20    The parties stipulated that the 2002 Lexus with license plate CA93987 was registered to defendant and that defendant had two qualifying convictions for purposes of the AHC offense.

¶ 21    Chicago police detective George Junkovic testified that he was assigned to recover video evidence from the Shell gas station related to an incident occurring on July 9, 2022. He went to the Shell gas station with another detective and a police officer and spoke with Munawar, who provided him with a flash drive containing the requested surveillance footage. On cross-examination, Detective Junkovic testified that he did not recall the name of the detective who sent him the video retrieval request.

¶ 22    Juan Hernandez testified that he was working as a cashier at the Shell gas station on the night in question. During his shift, between 11 and 11:30 p.m., "[s]ome guy shot himself in the foot." Specifically, he testified that he was standing behind the counter, which has a glass divider, and he was ringing up a customer. There was another customer in line who Hernandez described as "African-American, 6 feet tall" and wearing "all black" and a hat and sunglasses. Hernandez then heard a loud bang, "[l]ike a gunshot[.]" Hernandez testified that he was familiar with the sound of gunshots, as he heard "them everyday pretty much" because he "grew up in a rough neighborhood." According to Hernandez, the customer directly in front of him "stuttered" or "ducked" and he noticed the other customer in all black was gone. Hernandez initially thought that the gunshot came from outside, but the customer still in the store pointed out a "trail of blood" that lead to the exit. Hernandez mopped the floor, and he observed a shell "fragment," which he swept towards a dustpan and left on the floor. He then called his boss, who instructed him to call 911 and make a police report. Hernandez testified that he did not observe blood or a fragment on the floor when he started his shift at 10 p.m. Hernandez testified that the man in all black did not pay for gas or purchase anything. The surveillance videos from the gas station were played for the jury,

and Hernandez identified both the customer at the counter and defendant as the person in line. He also pointed out where he observed the blood on the floor and identified a sports utility vehicle exiting the parking lot. He testified that the fragment was found near the front of the counter area.

¶ 23    On cross-examination, Hernandez testified that, at the start of his shift, he would walk around the interior of the gas station, check the bathroom, and make sure there was no garbage on the floor. He further testified that, throughout his shift, he would inspect floor of the gas station whenever possible. Defendant played an extended version of the surveillance video of the interior of the gas station for the jury. Hernandez testified that there was not a lot of blood and he did not taste or smell the substance, but "to [his] knowledge that was blood." Hernandez did not see himself sweeping or mopping in the video. Finally, Hernandez testified that he knew that the bullet fragment "[c]ame from that person that shot himself."

¶ 24    Detective Mark Tamlo testified that, on July 11, 2022, he was assigned to investigate a shooting that occurred on July 9, 2022, at the Shell gas station located at 1768 West Armitage Avenue. He learned that there was an individual who was shot that drove himself to the hospital, and he reviewed the surveillance video footage from the gas station and also went to the gas station to speak with Hernandez. Detective Tamlo attempted to contact Tyrone Muhammad, who defendant had reported was with him on the night of July 9, 2022. He was unable to reach Muhammad despite leaving multiple voicemail messages. Detective Tamlo issued an investigative alert that there was probable cause to arrest defendant for aggravated discharge of a firearm.

¶ 25    On cross-examination, Detective Tamlo acknowledged that a July 23, 2022, supplementary report, which he authored, indicated the location of the occurrence as 1514 North Milwaukee Avenue. On redirect examination, he confirmed that he listed that address because it was the

location reported to him by defendant. On recross examination, Detective Tamlo confirmed that no firearm was ever recovered related to this case.

¶ 26   Dr. Sean Tubridy testified that he treated defendant at St. Mary's Hospital on July 10, 2022. Defendant had been transferred from St. Elizabeth's Hospital to St. Mary's Hospital. Dr. Tubridy observed two gunshot wounds on defendant's left posterior thigh and gunshot wounds to the top and bottom of his right foot. Defendant also had fractures in his right foot. Dr. Tubridy testified that the wounds were cleaned and bandaged and defendant's foot was placed in a splint for stabilization. According to Dr. Tubridy, defendant informed him that he "was closing up his shop on Milwaukee[,]" he saw "two guys getting in an argument[,]" and he "felt he had been shot and was able to drive himself to the closest hospital." On cross-examination, Dr. Tubridy testified that he did not document any gun powder burns on defendant and he could not testify as to entry or exit wounds or trajectory.

¶ 27   The State rested, and the court denied defendant's motion for a direct finding.

¶ 28   Defendant called Officer Clifford as a witness. Officer Clifford testified that on July 9, 2022, he was patrolling the entertainment area of Milwaukee Avenue. He heard through the dispatch radio "a call for a person shot" and he and his partner, Officer Resendiz, "volunteered to go to the hospital to speak with the individual who was shot." The dispatch also stated that "the caller related that it happen[ed] somewhere on [the] 1500 block of Milwaukee" and that either a silver Lexus or silver Mercedes may have been involved. Officer Clifford testified that, at the hospital, he spoke to the doctor at some point and Officer Resendiz was "mainly talking to" defendant. Officer Clifford testified that he did not have his body-worn camera activated to protect the privacy of other patients in the emergency room.

¶ 29    Defendant testified in his own defense to the following. On July 9, 2022, from 7 p.m. to 11 p.m., he was at a "dispensary café" called Chitiva, located at 1948 West North Avenue. He was with Darnell Wilson, Samuel Wilson, and Tyrone Muhammad. Defendant was there as "door detail," *i.e.*, making sure "the neighborhood and customers feel secure[,]" and "hype man[,] just welcoming customers[.]" Defendant then introduced into evidence a video showing him in the dispensary. He testified that the video was taken "shortly after 10:00 p.m." on his cellphone "during a Facebook Live on the night of July 9th." Darnell can also be seen in the video. Defendant testified that around 11 p.m., when the dispensary closed, he and Muhammad decided to canvass the area. Defendant acknowledged that he is on the surveillance footage from the interior of the gas station, and he testified that the "flash" that can be seen on the video was from his vape pen. Defendant further testified that, in the Facebook Live video, he exits the gas station and tells Muhammad what just occurred and Muhammad "laughed it off." Defendant and Muhammad then traveled back to the Milwaukee Avenue entertainment district "to continue [their] violence prevention work." When they arrived near 1514 Milwaukee Avenue, they "noticed an altercation" and then he heard two to four gunshots and "instantly knew" he got hit in the foot. Defendant "jumped in [his] car" and "drove [himself] to the hospital." Defendant testified that he spoke with three different police officers while he was in the hospital.

¶ 30    On cross-examination, defendant testified that he did not call the police to the area when he saw the altercation and heard the gunshots and he did not call an ambulance because it would have taken too long. He also testified that he did not see the shooter and could not provide a description of the shooter. Defendant testified that he was shot near 1514 Milwaukee Avenue, and he denied that he informed Officer Resendiz that he was shot leaving District. Defendant also testified that Dr. Tubridy "paraphrased" when he stated that defendant told him he was "closing

up his shop" when he was shot. Rather, defendant testified that he informed Dr. Tubridy that "we were at the dispensary which we were, and then after closing is when I got hurt."

¶ 31 In viewing the video of himself entering and exiting the gas station, defendant testified that he was not limping or hobbling when he was walking into the gas station and he was "skipping" when he exited the gas station. He denied that he was "limping" back to his car. When asked if he did not replace his gas cap, he responded: "Looks like I forgot." He confirmed that he did not pay for gas and he did not buy anything in the store. When shown the video of himself inside the gas station, defendant testified that the "flash" was his vape pen, which had "popped." Defendant stated that the vape pen did not explode; he explained that you hit the button on the vape pen, "it generates heat in order for the vape to work[,]" and he assumed that "it overheated[,] popped." He stated that he did not receive a burn when this occurred and he was not bleeding. Defendant further testified that this was the first time anyone had asked him what happened at the gas station, so he had not told anyone about it previously.

¶ 32 Darnell Wilson testified that he is a Chicago Transit Authority bus driver, and on the night of July 9, 2022, he was at Chitiva on North Avenue. He arrived there around 8 or 8:30 p.m. and left before the dispensary closed at 11 p.m. Defendant was also at the dispensary. Defendant played the Facebook Live video and Wilson identified himself in the video. On cross-examination, Wilson testified that he has known defendant for 20 years, and he agreed that he is "close with him[.]"

¶ 33 Samuel Wilson testified that he was retired from the County Club Hills Fire Department and now owned Chitiva. He testified that, on July 9, 2022, he was at Chitiva and defendant was also present. He identified himself and defendant in the Facebook Live video. He testified that defendant left the dispensary "somewhere after 11:00."

¶ 34    Tyrone Muhammad testified that he is the executive director of Ex Cons for Community and Social Change (ECCSC), he is an "ex-con," and defendant was one of his employees. He testified that, sometime after 10 p.m. on July 9, 2022, he was at the dispensary at 1948 West North Avenue with defendant. They left before the dispensary closed at 11 p.m. and drove to the gas station in separate cars. Muhummad stayed outside and paid for gas at the pump while defendant went inside and came back out. They then drove back to the area where the dispensary was located. While in that area, he heard gunshots. Muhummad testified that there was an "incident" that "stemmed from a club or something in that area." He agreed that defendant was "deescalating the situation" and, after he heard gunshots, he heard defendant state that he had been shot in the leg. Defendant then left the area in his silver Lexus. Muhammad further testified that the detectives "left a card on [his] door." He called and left a message for the detective but never heard back from him.

¶ 35    On cross-examination, Muhammad admitted that he was previously convicted of first degree murder. He testified that he did not call the police, flag down any nearby police officers, call an ambulance, or file a police report after defendant was shot. He confirmed that defendant drove himself to the hospital. He further admitted that he never told anyone about the shooting before testifying at trial. Finally, Muhammad testified that he did not recall defendant being hurt when he exited the gas station and he admitted that he put the gas cap back on defendant's car.

¶ 36    Defendant rested his case. In rebuttal, the State introduced certified copies of defendant's two prior convictions for aggravated robbery. The jury found defendant guilty of AHC.

¶ 37    On August 28, 2023, defendant filed a motion for judgment of acquittal or, in the alternative, a new trial. Therein, defendant argued, *inter alia*, that there was insufficient evidence to find him guilty of AHC and the court erred in denying his motion to quash arrest and suppress

evidence. On October 10, 2023, the State filed a response. On November 3, 2023, the court denied defendant's motion.

¶ 38    On December 5, 2023, following a hearing, the court sentenced defendant to 10 years' imprisonment.

¶ 39    This appeal followed.

¶ 40                                    II. ANALYSIS

¶ 41    On appeal, defendant argues that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) he was denied his right to a fair trial where the State elicited improper hearsay testimony; (3) the State violated his constitutional rights by arresting him pursuant to an investigative alert; and (4) the AHC statute is facially unconstitutional.

¶ 42                              A. Sufficiency of the Evidence

¶ 43    Defendant first argues that the State failed to prove beyond a reasonable doubt that he was guilty of AHC. In particular, he contends that the evidence was insufficient because no one testified that they saw him with a firearm, no firearm was recovered, no physical evidence connected him to a firearm, and he presented credible evidence that someone else shot him near 1514 North Milwaukee Avenue.

¶ 44    When a defendant challenges the sufficiency of the evidence against him, this court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "It is the reviewing court's function to carefully examine the evidence, giving due consideration to the fact that the court and the jury saw and heard the witnesses." *People v. Armstead*, 322 Ill. App. 3d 1, 10 (2001). Further, a reviewing court is not

required "to search out all possible explanations consistent with innocence or be satisfied as to each link in the chain of circumstances." *People v. Wheeler*, 226 Ill. 2d 92, 117-18 (2007). That said, "the fact that defendant is 'probably' guilty does not equate with guilt beyond a reasonable doubt." *People v. Ehlert*, 211 Ill. 2d 192, 213 (2004). A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 45 "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35. A person commits the offense of AHC when he "receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times" of certain qualifying offenses. 720 ILCS 5/24-1.7(a) (West 2020). Defendant does not contest that his criminal history meets the requirements for AHC. Rather, he solely argues that the State failed to prove that he possessed a firearm.

¶ 46 "Possession of a firearm can be either actual or constructive." *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27. To prove actual possession, there must be evidence that the defendant exercised some dominion over the firearm, "such as that he had it on his person, tried to conceal it, or was seen to discard it." *Id.* However, the State "is not required to show personal touching of the firearm." *People v. Daniels*, 2025 IL App (1st) 230823, ¶ 19. Further, possession may be inferred by circumstantial evidence. *People v. Love*, 404 Ill. App. 3d 784, 788 (2010).

¶ 47 Circumstantial evidence consists of proof of facts or circumstances giving rise to reasonable inferences of other facts which tend to establish the defendant's guilt or innocence. *People v. Saxon*, 374 Ill. App. 3d 409, 417 (2007). "Circumstantial evidence is sufficient to sustain a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Campbell*, 146 Ill. 2d 363, 379 (1992). The trier of fact may consider inferences that

flow naturally from the evidence; however, the trier of fact is not required to "search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Id.* at 380. "All reasonable inferences from the evidence must be drawn in favor of the prosecution." *People v. Hardman*, 2017 IL 121453, ¶ 37.

¶ 48    After viewing the evidence in the light most favorable to the prosecution, we conclude that sufficient evidence was presented at trial to support the jury's verdict.

¶ 49    Here, the State presented at trial Hernandez, who was working at the gas station at the time of the alleged crime. He testified that there was a loud bang that sounded like a gunshot, one of the customers, who was identified as defendant, left the store immediately afterwards, and moments later Hernandez observed a red substance that he believed to be blood on the floor of the gas station with a trail leading to the exit of the gas station. Hernandez also found a fragment of a bullet while cleaning up the red substance. Hernandez testified that he checked the store at the beginning of his shift at 10 p.m., ensuring there was no garbage on the floor and the floors were clean. He did not see either blood or a bullet fragment prior to defendant's presence in the gas station that night. No evidence was presented suggesting Hernandez was not credible or that he had any known bias against defendant. See *People v. Harris*, 2018 IL 121932, ¶ 27 (testimony of single witness is sufficient to convict if positive and credible).

¶ 50    The video clips from the gas station also largely corroborate Hernandez's testimony. In the interior videos, defendant is seen entering the gas station, fiddling with something in the left back pocket of his pants, a flash is seen near defendant's legs, the other customer is startled and looks at defendant, and defendant looks down at his foot and quickly exits the gas station. After defendant left, the customer and Hernandez both looked at the floor where defendant was standing

multiple times. In the video of the exterior, defendant, after exiting the building, can be seen looking at his foot again and there are at least two steps he takes where he is clearly limping.

¶ 51　Moreover, defendant admitted that he was at the gas station and that he left the store, did not buy anything, including gas, and drove away minutes after arriving at the gas station, forgetting to replace his gas cap. Muhammad testified that he replaced the gas cap before defendant drove off. Defendant admitted that he drove himself to the hospital where he was treated for two gunshot wounds to the left thigh and two gunshot wounds to the right foot. It is the State's burden to present "some evidence giving rise to a reasonable inference of the defendant's guilt; the State may not leave to conjecture or assumption essential elements of the crime." *Daniels*, 2025 IL App (1st) 230823, ¶ 16. The State's evidence in this case furnished the requisite reasonable inference to prove possession, and we would not characterize the evidence as merely conjecture or assumptions. As such, we cannot say that no rational jury could have found defendant guilty of AHC beyond a reasonable doubt.

¶ 52　Nonetheless, defendant asserts numerous issues with the State's case, including that no firearm was recovered, no firearm was seen on the surveillance footage, Hernandez testified that he believed the gunshot came from outside, the alleged trail of blood could not be seen on the surveillance footage, the red substance was not confirmed to be blood, no testing was conducted on the fragment, and Dr. Tubridy could not determine entry and exit wounds and did not see powder burns consistent with close-range firing. According to the State, defendant's arguments merely point out alleged weaknesses in the State's case, which were presented to and rejected by the jury.

¶ 53　We agree with the State. " 'Determinations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are the

responsibility of the trier of fact.' " *People v. Emerson*, 189 Ill. 2d 436, 475 (2000) (quoting *People v. Nitz*, 143 Ill. 2d 82, 95 (1991)). Further, where the evidence produces "conflicting inferences" it is the trier of fact's responsibility to resolve that conflict. *People v. Pryor*, 372 Ill. App. 3d 422, 430 (2007). Here, the trier of fact, *i.e.*, the jury, heard the State's evidence and heard defendant's conflicting evidence. Its finding of guilt implies that it did not find defendant's account of how he sustained those gunshot wounds at all credible. We also note that defendant's account of a shooting in the entertainment district near 1514 North Milwaukee Avenue was contradicted by Officer Gipson's testimony that, while on patrol of that area of Milwaukee Avenue, there was no dispatch of a shooting in the area, he did not hear any gunshots that evening, and he did not see anything to suggest that there had been a shooting, such as groups of people disbursing and running from the area. As noted previously, we must consider all evidence in the light most favorable to the prosecution, not in the light most favorable to defendant. *Wheeler*, 226 Ill. 2d at 117. In this case, that leads to a reasonable inference that defendant shot himself at the Shell gas station, not that he was shot later by an unidentified individual on Milwaukee Avenue.

¶ 54    Additionally, we find *People v. Sams*, 2013 IL App (1st) 121431, and *In re Nasie M.*, 2015 IL App (1st) 151678, cited by defendant for support of his argument that the evidence was insufficient where there was no physical evidence proving his possession of a firearm, to be factually distinguishable.

¶ 55    In *Sams*, the defendant was found guilty of unlawful use of a weapon by a felon. *Sams*, 2013 IL App (1st) 121431, ¶ 1. The State presented evidence that the police received two dispatch calls related to the same residence, one caller merely requested police assistance and the other stated that a man had pointed a gun at her son and mentioned the defendant's name as the one in possession of the gun. *Id.* ¶ 4. The second caller did not describe the gun or the offender. *Id.* When

officers responded, defendant was arrested when he exited the residence, and inside the residence, an officer observed the living room in disarray, an apparent blood stain on the couch, and later a shotgun under the couch. *Id.* ¶ 5. On appeal, this court held that the State failed to prove beyond a reasonable doubt that the defendant knew of the firearm's presence and exercised control and dominion of the area where it was found. *Id.* ¶ 11. The court reasoned that the two 911 calls from unidentified individuals were insufficient to support the conviction where the calls did not include a description of the offender or the gun, the officers never saw the defendant with the gun, the gun was "not easily visible or accessible," the defendant did not live at the residence where the gun was found, and there was otherwise no physical evidence connecting the defendant to the gun. *Id.* ¶¶ 12-16.

¶ 56    In *Nasie*, the defendant sustained gunshot wounds to his foot, and the State filed a petition for adjudication of wardship based on allegations that he shot himself in the foot with a firearm. *Nasie*, 2015 IL App (1st) 151678, ¶ 5. The defendant was found guilty of reckless discharge of a firearm, aggravated unlawful use of a weapon, and unlawful possession of a firearm. *Id.* ¶ 15. The court's finding was based on a detective's testimony that he spoke to the defendant at the hospital. *Id.* ¶ 16. According to the detective, the defendant first stated that he was shot at while running away from two individuals, but he later changed his story and admitted to shooting himself in the foot. *Id.* ¶ 7. Additional evidence consisted of a revolver found in the defendant's girlfriend's home and a shell casing found in the lot where the incident had allegedly occurred. *Id.* ¶¶ 9-10. In court, the defendant denied that he made such an admission and stated that he was under the influence of pain medication and did not recall speaking to the police while in the hospital. *Id.* ¶ 14. The court found the detective credible and the defendant not credible. *Id.* ¶ 16. On appeal, this court noted that, even where a conviction turns on the trier of fact's credibility determinations, the conviction

may nonetheless be reversed " 'where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *Id.* ¶ 34 (quoting *People v. Smith*, 185 Ill. 2d 532, 541 (1999)). The court found that was the case in *Nasie* where there was no medical testimony to support the State's theory that the defendant's gunshot wound was self-inflicted, there was no evidence that the defendant was in possession of the gun when he injured his foot, the State agreed at oral argument that the shell casing could have been from a prior shooting, the casing did not match the gun found in the girlfriend's apartment, and there were inconsistencies in the testimony of the State's witnesses. *Id.* ¶¶ 32-37.

¶ 57 We acknowledge some of the similarities between the facts of this case and the facts in *Sams* and *Nasie*. For instance, like in those cases, there was no evidence presented that defendant was seen physically holding a firearm nor any evidence connecting defendant to any weapon as one was never recovered. Additionally, like in *Nasie*, there was no testimony as to the nature of defendant's gunshot wounds or the potential trajectory of a bullet compared to the entry and exit wounds.

¶ 58 However, we find that there are significant differences between those cases and this one. Here, defendant sustained gunshot wounds to the thigh and foot that he claimed he received while "deescalating" an altercation in the entertainment district of Milwaukee Avenue. However, Hernandez, a credible witness and an identified 911 caller, testified at trial that, while he was working at the Shell gas station, a customer, identified via surveillance footage as defendant, shot himself in the foot. As he was ringing up a customer, Hernandez heard a gunshot, which he initially believed came from outside, the customer in front of him "stuttered" or "ducked," and the customer then pointed out a trail of a red substance leading to the door whereby defendant had just exited without purchasing anything. While cleaning up the red substance, Hernandez found a bullet

fragment on the floor near the area where defendant had been standing. There was also testimony of a "flash" that could be seen on the surveillance footage just before defendant exited the gas station, although he claimed it was his vape pen "popping." The video evidence in this case additionally distinguishes these facts from those in *Nasie* and *Sams*, where it corroborated Hernandez's testimony and showed defendant limping after leaving the gas station. Hernandez's testimony, coupled with the corroborating surveillance footage, provided the credible, unbiased evidence to support the reasonable inference that defendant possessed a gun in the gas station, evidence which was lacking in *Nasie* and *Sams*. Additionally, in contrast to those cases, here, the only inconsistency with law enforcement witnesses' testimony was the location of the report of the incident, which they admitted was inaccurately identified in their police reports.

¶ 59    Therefore, we conclude that the jury's finding that defendant was guilty of AHC was proper.

¶ 60                              B. Improper Hearsay Testimony

¶ 61    Next, defendant argues that he was denied his right to a fair trial where the State elicited improper hearsay testimony that a "shooting occurred at the gas station and that everyone interviewed about a possible shooting at 1514 North Milwaukee Avenue reported that it had been a peaceful night."

¶ 62    Generally, all relevant evidence is admissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). " 'Relevant evidence' is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *People v. Pikes*, 2013 IL 115171, ¶ 21 (citing Ill. R. Evid. 401 (eff. Jan. 1, 2011)). However, "[h]earsay is not admissible except as provided by [Illinois Rules of Evidence], by other rules prescribed by the Supreme Court, or by statute as provided in Rule 101."

Ill. R. Evid. 802 (eff. Jan. 1, 2011). Hearsay is an out-of-court statement that is offered to establish the truth of the matter asserted. *People v. Simms*, 143 Ill. 2d 154, 173 (1991). "The basis for excluding evidence under the hearsay rule lies in the fact that an opportunity to ascertain the veracity of the testimony is absent." *Armstead*, 322 Ill. App. 3d at 11; *People v. Jura*, 352 Ill. App. 3d 1080, 1805 (2004) ("The fundamental reason for excluding hearsay is the lack of an opportunity to cross-examine the declarant.").

¶ 63     The admissibility of evidence is within the trial court's discretion, and its ruling will not be disturbed unless there has been an abuse of that discretion. *People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 39. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

¶ 64     However, defendant concedes that these assertions of error were not properly preserved, and, therefore, he requests that we review for plain error. The plain error doctrine is a narrow and limited exception to the rule of forfeiture. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). To obtain relief under this doctrine, a defendant must show either that (1) the evidence at trial was closely balanced, or (2) the error was so serious as to deny the defendant a fair trial and challenge the integrity of the judicial process. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Whether forfeiture may be avoided under either of these theories requires us first to determine whether a clear error occurred. *People v. French*, 2017 IL App (1st) 141815, ¶ 27. For the following reasons, we find no plain error.

¶ 65     We first address defendant's contention that it was improper for the State to repeatedly elicit testimony from Officer Cauinian and Detective Tamlo about a "shooting" at the Shell gas station. In particular, he points to the following testimony. Officer Cauinian testified that, on July

9, 2022, he and his partner, through the radio dispatcher, "got dispatched to a job on a person shot" at the address of 1768 West Armitage Avenue, the Shell gas station. Officer Cauinian was also asked: "When you spoke with Juan Hernandez, were there any other witnesses on the scene that were present for the shooting?", and he responded in the negative. Additionally, during the direct examination of Detective Tamlo, the following exchange took place:

"Q. Detective, I am directing your attention to July 11, 2022 were you assigned to investigate the shooting *** occurring on July 9, 2022?

A. Yes, I was.

Q. Did your investigation begin on July 11th?

A. Yes.

Q. Were you investigating a shooting that occurred [at] 1768 West Armitage in Chicago?

A. Yes ma'am.

Q. What is at that location?

A. It's a Shell gas station.

Q. Once you were assigned to the case, did you learn there was an individual shot that had self-transported to the hospital?

A. Yes.

* * *

Q. Now did you learn that there was surveillance video at this gas station where the shooting occurred?

A. Yes.

* * *

Q. Were you ultimately looking to arrest Gregory Sherman?

A. Yes.

Q. That was in relation to the shooting that occurred at the gas station[,] correct[?]

A. Yes, that's correct."

¶ 66    As to Officer Cauinian, defendant contends that "the content of the dispatch was inadmissible hearsay because it went to the central issue in the case: whether there was a shooting at the gas station." As to Detective Tamlo, defendant asserts that his testimony "was more egregious" because he testified that there was a shooting at the gas station and that defendant was the person shot. In response, the State argues that Officer Cauinian's testimony "explained why he went to the gas station" and Detective Tamlo's testimony explained "what he was assigned to investigate and who the subject of the investigation was."

¶ 67    Our supreme court has held that "a police officer may recount the steps taken in the investigation of a crime, and may describe the events leading up to the defendant's arrest, where such testimony is necessary and important to fully explain the State's case to the trier of fact." *Simms*, 143 Ill. 2d at 174; *People v. Malave*, 230 Ill. App. 3d 556, 561 (1992) (such statements are admissible "for the limited purpose of explaining why the police conducted their investigation as they did, or why they arrested defendant, or why they confronted [the] defendant with their suspicions"). The reasoning behind the rule is that "a portrayal of the events in question lessens the need of the fact finder to speculate on the reasons for the officers' subsequent actions." *Id.* Nonetheless, "[t]he testimony of the officer regarding the words of the communication must not be used for their truth by the prosecution, but only used to show that the words were spoken when the fact they were spoken satisfies a relevant nonhearsay purpose." *Jura*, 352 Ill. App. 3d at 1086.

¶ 68 In this case, Officer Cauinian's and Detective Tamlo's testimony as to the nature of the dispatch call and the reason for their investigation certainly can be characterized as "course of investigation" testimony. However, the difficulty here is that that testimony also tended to prove the truth of the matter asserted, *i.e.*, whether there was a shooting or a person shot at the Shell gas station that night. When a statement goes directly to the essence of the dispute at trial, regardless of whether it related to police procedure, "the scale tips against admissibility." *People v. Warlick*, 302 Ill. App. 3d 595, 600 (1998). In this case, it was not "necessary and important" for the State to provide those details of the dispatch call when questioning Officer Cauinian and Detective Tamlo. Rather, the State could have referred to it as "an incident" at that location, and, later, Hernandez could testify himself as to the substance of his 911 call following the incident. See *People v. O'Toole*, 226 Ill. App. 3d 974, 988 (1992) (Out-of-court statements explaining a course of conduct "should be admitted only to the extent necessary to provide that explanation and should not be admitted if they reveal unnecessary and prejudicial information.").

¶ 69 Several cases cited by defendant support our conclusion that the State elicited improper hearsay testimony in their questioning of both Officer Cauinian and Detective Tamlo. For example, in *Warlick*, this court held that the trial court erred in admitting an officer's testimony that he had received a radio call regarding a "burglary in progress" at a warehouse where the matter in controversy at trial was whether defendant had been seeking shelter or to burglarize. *Warlick*, 302 Ill. App. 3d at 600-01. Notably, the error in *Warlick* was ultimately held to be harmless. *Id.* at 601. Next, in *Jura*, a gun possession case, this court found that trial court erred in admitting testimony from three police officers as to the substance of a radio call which provided the location and description of a person with a gun and that the defendant's location and description matched it. *Jura*, 352 Ill. App. 3d at 1086-88. The *Jura* court found that the hearsay statements directly

addressed the essence of the dispute, *i.e.*, whether the defendant was the person who committed the crime. *Id.* at 1088. Additionally, in *People v. Cordero*, 244 Ill. App. 3d 390, 391-92 (1993), the reviewing court found that two officers' testimony as to the contents of a police dispatch stating that a vehicle was reported stolen was inadmissible hearsay because it "went to the very essence of the stolen vehicle offense" and the jury may have considered it for the truth of the matter asserted. Nonetheless, the *Cordero* court found that the error was harmless. *Id.* at 393. Finally, in *People v. Thomas*, 199 Ill. App. 3d 79, 98 (1990), a police officer testified that he received a radio dispatch informing him of an "intoxicated driver" and provided the type of car and license plate number, and the trial court allowed the testimony under the course of investigation exception. The Second District of this court found that the testimony went beyond the officer's investigatory procedure and was inadmissible hearsay testimony where the defendant was charged with driving under the influence. *Id.* at 99. In accordance with those decisions, we find that, in this case, the State elicited improper hearsay testimony at trial.

¶ 70    Defendant also asserts that the State elicited inadmissible hearsay through Officer Gipson, who testified that he spoke to community members and bar staff on Milwaukee Avenue and "[e]veryone corroborating said it was pretty peaceful, nothing seemed out of the norm." We agree with defendant, and the State does not dispute, that this constituted inadmissible hearsay, as it was clearly based on out-of-court statements and was offered to establish the truth of the matter asserted, *i.e.*, that there were no shootings on Milwaukee Avenue that night and contrary to his own account, defendant could not have been shot in that area.

¶ 71    Defendant argues that we should reverse his conviction and remand for a new trial under either prong of plain error review. Although we find error in the court's admission of the improper hearsay testimony, we find no plain error.

¶ 72     We begin first with the second prong of the plain error analysis, which requires that the error be "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." (*Hall*, 195 Ill. 2d at 20). Plain error review is not applicable to the type of error identified here. Our supreme court has "equated the second prong of plain-error review with structural error[.]" *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010). Structural errors are a limited category, having only been found in cases involving, "a complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction." *Id.* at 609. Additionally, structural error has been found where the trial court failed to apply the one-act, one-crime rule (*In re Samantha V.*, 234 Ill. 2d 359, 378-79 (2009)) and where the trial court failed to exercise discretion in denying a continuance (*People v. Walker*, 232 Ill. 2d 113, 131 (2009)). The admission of improper hearsay testimony does not fall into any of the foregoing categories. See *People v. Temple*, 2014 IL App (1st) 11653, ¶ 51 (finding that, *inter alia*, police officer hearsay testimony beyond the scope of explaining procedure did not constitute structural error). Thus, we find no plain error under the second prong.

¶ 73     As to the first prong, we conclude that the evidence in this case was not "so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error[.]" *People v. Belknap*, 2014 IL 117094, ¶ 48. Stated another way, we do not find that the verdict in this case "may have resulted from the error and not the evidence properly adduced at trial." (Internal quotations and citation omitted.) *People v. White*, 2011 IL 109689, ¶ 133. Under this prong, we "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. As we explained above, the jury had sufficient evidence to find beyond a

reasonable doubt that defendant was in possession of a firearm. We will not use the word overwhelming to describe the evidence in this instance, but there was unimpeached, credible testimony from Hernandez that supported a reasonable inference that defendant shot himself in the foot at the gas station that night, and the surveillance footage corroborated Hernandez's testimony. Given the nature of this evidence, defendant cannot show that the improper hearsay testimony severely threatened to tip the scales of justice against him.

¶ 74     Additionally, we do not believe that the brief improper mentions in Officer Cauinian and Detective Tamlo's testimony of a "shooting" or "a person shot" or Officer Gipson's testimony alluding to his conversation with bystanders and bar employees in the area greatly contributed to the jury's finding of guilt. Rather, this testimony was cumulative of other proper testimony. First, the dispatch call was based on Hernandez's phone call to the police, which he explicitly testified about at trial. Second, defendant himself asked Officer Cauinian specifically about the dispatch call "of a person shot." Finally, Officer Gipson's improper hearsay testimony was cumulative of his other testimony. In particular, he testified that he was on patrol in his car and on foot in that area and no one informed him of any shootings, he did not hear any gunshots that evening, and he did not see anything to suggest that there had been a shooting, such as groups of people disbursing and running from the area.

¶ 75     As the evidence was not closely balanced and there has been no structural error, plain error has not been established.

¶ 76                              C. Investigative Alert

¶ 77     Next, defendant argues that the State violated his rights under the United States and Illinois Constitutions against unreasonable seizures by arresting him 46 days after the alleged incident pursuant to an investigative alert, rather than pursuant to a probable cause finding by a neutral

magistrate. Relying on *People v. Bass*, 2019 IL App (1st) 160640, and *People v. Smith*, 2022 IL App (1st) 190691, defendant maintains that, because of this unreasonable seizure, his arrest and the fruits thereof should have been suppressed, and we should remand for a new trial.

¶ 78    As the State correctly asserts, the supreme court's opinion in *People v. Clark*, 2024 IL 127838, which was issued after defendant filed his brief, is dispositive of this issue. In his reply brief, defendant agrees and concedes that *Clark* is binding authority upon this court regarding this issue.

¶ 79    Briefly, in *Clark*, the defendant, who was charged with multiple counts of attempted first degree murder and aggravated battery, moved to quash his arrest, which was effectuated pursuant to an investigative alert, as well as his inculpatory statement made after the arrest. *Id.* ¶ 1. The trial court denied the motion, and the defendant was eventually convicted of two counts of aggravated battery with a firearm. *Id.* ¶¶ 1-2. The appellate court held that the trial court did not err in denying the motion to quash arrest and suppress his statement. *Id.* ¶ 22. On appeal to the supreme court, the defendant argued that the Chicago Police Department's investigative alert system was inconsistent with the United States and Illinois Constitutions. *Id.* ¶ 29. The supreme court, in a thorough analysis, expressly rejected the reasoning of *Bass*, 2019 IL App (1st) 160640, and *Smith*, 2022 IL App (1st) 190691. *Id.* ¶¶ 55-62. The court then held that there is no violation of the Illinois Constitution through the use of investigative alerts to make warrantless arrests for felonies based upon probable cause. *Id.* ¶ 63. Therefore, in the case before us, defendant's arrest was constitutional under *Clark*, and the trial court did not err in upholding defendant's arrest.

¶ 80                    D. Constitutionality of AHC Statute

¶ 81    Finally, defendant argues that this court should vacate his conviction for AHC where the statute is facially unconstitutional under the United States Constitution and pursuant to *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022).

¶ 82    The statute at issue, section 24-1.7(a) of the Criminal Code of 2012 (720 ILCS 5/24-1.7(a) (West 2022)), provided, in pertinent part at the time of his conviction, that it is unlawful for a person to possess any firearm after having been convicted two or more times of any combination of certain enumerated felonies.

¶ 83    "Statutes are presumed to be constitutional." *People v. Legoo*, 2020 IL 124965, ¶ 29. "To overcome this presumption, the party challenging the statute must clearly establish that it violates the constitution." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). A party may assert a facial constitutional challenge to a statute at any time. *People v. Villareal*, 2023 IL 127318, ¶ 13. "[A] facial challenge requires a showing that the statute is unconstitutional under any set of facts, *i.e.*, the specific facts related to the challenging party are irrelevant." *People v. Thompson*, 2015 IL 118151, ¶ 36. Where there is a situation in which the statute could be validly applied, the facial challenge cannot succeed. *People v. Rizzo*, 2016 IL 118599, ¶ 24. We review a statute's constitutionality *de novo*. *Gray*, 2017 IL 120958, ¶ 57.

¶ 84    The second amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The second amendment applies to the States through the fourteenth amendment of the United States Constitution. *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010).

¶ 85    In *Bruen*, the Supreme Court set forth a new analytical framework for evaluating the constitutionality of firearm regulations under the second amendment. *Bruen*, 597 U.S. at 17. First, a court must determine whether "the Second Amendment's plain text covers an individual's

conduct." *Id.* at 24. If it does, then the Constitution "presumptively protects that conduct" and the government must justify the regulation by showing that it is consistent with our nation's historical tradition of firearm regulation. *Id.* Such a showing can be made by identifying a reasonably similar historical analogue to the regulation at issue. *Id.* at 30.

¶ 86 Defendant argues that, under *Bruen*, his "conduct of possessing a weapon is presumptively protected by the Second Amendment, irrespective of his prior convictions" and the State "cannot meet its burden to show any historical analogue for this constitutionally defunct law."

¶ 87 Our sister districts and the divisions of this district have considered this same issue on many occasions, and, in each instance, this court has applied the *Bruen* test and rejected facial challenges to the AHC statute. See, *e.g.*, *People v. Lopez*, 2025 IL App (1st) 232120, ¶ 22 (collecting cases finding the AHC statute constitutional on its face), *pet. for leave to appeal pending*, No. 131973 (filed June 26, 2025). Although our supreme court has yet to weigh in on the constitutionality of the AHC statute (or similar statutes, such as unlawful use of a weapon statute), several cases involving this issue are currently pending leave to appeal in that court. See *People v. Grace*, 2025 IL App (1st) 232429-U, ¶ 13 (collecting cases), *pet. for leave to appeal pending*, No. 132119 (filed Aug. 8, 2025); Ill. S. Ct. R. 23(e)(1) (eff. June 3, 2025) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 88 Notably, the appellate court is split as to the result at the first step of the *Bruen* test. See *People v. Wade*, 2025 IL App (1st) 231683, ¶ 48 (noting split in approach), *pet. for leave to appeal pending*, No. 132355 (filed Oct. 8, 2025). Some districts and divisions have found that the second amendment is not applicable to individuals who are not "law-abiding citizens" (see, *e.g.*, *People v. Baker*, 2023 IL App (1st) 220328, ¶ 37, *pet. for leave to appeal pending*, No. 130174 (filed Nov. 3, 2023)), whereas others have found that a defendant's status as a felon is not relevant to the first

step and should be considered at the second step (see, *e.g.*, *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 89, *pet. for leave to appeal pending*, No. 130153 (filed Oct. 30, 2023)). We agree with those decisions finding that a felon cannot be considered a law-abiding citizen. Thus, we similarly conclude that the first step of the *Bruen* test is dispositive here and the AHC statute is facially constitutional.

¶ 89  We note that defendant specifically relies on *People v. Brooks*, 2023 IL App (1st) 200435, for support of his argument as to the first step. As mentioned above, in *Brooks*, this court found that the challenged conduct is covered by the plain text of the second amendment and a defendant's status as a felon is more appropriately considered at the second step of the *Bruen* test. *Id.* ¶¶ 84-89. However, the *Brooks* court ultimately found that "both the founding-era historical record and Supreme Court precedent support the ability of our legislature to prohibit firearm possession by people who have demonstrated disrespect for legal norms of society" (Internal quotation marks omitted.) *Id.* ¶ 100. Thus, the *Brooks* court ultimately arrived at the same conclusion, namely that the AHC statute is facially constitutional. See, *e.g.*, *People v. Woodhouse*, 2026 IL App (1st) 240827, ¶¶ 39-47 (following *Brooks*); *People v. McCorkle*, 2025 IL App (5th) 230238, ¶¶ 22-25 (same); *Wade*, 2025 IL App (1st) 231683, ¶¶ 47-50 (same); *People v. Macias*, 2025 IL App (1st) 230678, ¶¶ 28-34 (same); *People v. Travis*, 2024 IL App (3d) 230113, ¶¶ 25-33 (same); *People v. Stephens*, 2024 IL App (5th) 220828, ¶¶ 25-39 (same). For that reason, *Brooks* does not aid defendant here, and we are not persuaded to depart from this court's consistent rejection of facial challenges to statutes barring felons from firearm possession.

¶ 90  Accordingly, we reject defendant's argument that the AHC statute is facially unconstitutional.

¶ 91                                                III. CONCLUSION

¶ 92    For the reasons stated, we affirm the judgment of the circuit court.

¶ 93    Affirmed.

¶ 94    FITZGERALD SMITH, P.J., specially concurring:

¶ 95    I wholly agree with the outcome of this appeal. I write specially only with respect to the final issue in this matter regarding the constitutionality of the AHC statute, and simply to state that I would follow *People v. Brooks*, 2023 IL App (1st) 200435, to conclude that under the second step of the *Bruen* test, defendant here cannot succeed on a second amendment challenge to the AHC statute, thereby reaching the same ultimate result.